# HILLSBORO NATIONAL BANK *v.* COMMISSIONER OF INTERNAL REVENUE

No. 81–485.   Argued November 1, 1982—Decided March 7, 1983*

*Together with No. 81–930, *United States* v. *Bliss Dairy, Inc.*, on certiorari to the United States Court of Appeals for the Ninth Circuit.

O'CONNOR, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, POWELL, and REHNQUIST, JJ., joined, and in Parts I, II, and IV of which BRENNAN, J., joined. BRENNAN, J., filed an opinion concurring in part and dissenting in part, *post*, p. 403. STEVENS, J., filed an opinion concurring in the judgment in part and dissenting in part, in which MARSHALL, J., joined, *post*, p. 403. BLACKMUN, J., filed a dissenting opinion, *post*, p. 422.

*Harvey B. Stephens* argued the cause for petitioner in No. 81–485. With him on the briefs were *Mark H. Ferguson* and *Robert A. Stuart.*

*James Silhasek* argued the cause and filed a brief for respondent in No. 81–930.

*Solicitor General Lee* argued the cause for the United States in No. 81–930 and respondent in No. 81–485. With him on the briefs were *Assistant Attorney General Archer, Stuart A. Smith, Gary R. Allen, Jay W. Miller,* and *David I. Pincus.*†

JUSTICE O'CONNOR delivered the opinion of the Court.

These consolidated cases present the question of the applicability of the tax benefit rule to two corporate tax situations: the repayment to the shareholders of taxes for which they were liable but that were originally paid by the corporation; and the distribution of expensed assets in a corporate liquidation. We conclude that, unless a nonrecognition provision of the Internal Revenue Code prevents it, the tax benefit rule ordinarily applies to require the inclusion of income when events occur that are fundamentally inconsistent with an earlier deduction. Our examination of the provisions granting the deductions and governing the liquidation in these cases leads us to hold that the rule requires the recognition of income in the case of the liquidation but not in the case of the tax refund.

I

In No. 81–485, *Hillsboro National Bank* v. *Commissioner,* the petitioner, Hillsboro National Bank, is an incorporated bank doing business in Illinois. Until 1970, Illinois imposed a property tax on shares held in incorporated banks. Ill. Rev. Stat., ch. 120, § 557 (1971). Banks, required to retain earnings sufficient to cover the taxes, § 558, customarily paid

---

†Briefs of *amici curiae* urging affirmance in No. 81–930 were filed by *Jack R. White* and *Steven W. Bacon* for Ameron, Inc.; and by *Arthur A. Armstrong, pro se.*

the taxes for the shareholders. Under § 164(e) of the Internal Revenue Code of 1954, 26 U. S. C. § 164(e),[1] the bank was allowed a deduction for the amount of the tax, but the shareholders were not. In 1970, Illinois amended its Constitution to prohibit ad valorem taxation of personal property owned by individuals, and the amendment was challenged as a violation of the Equal Protection Clause of the Federal Constitution. The Illinois courts held the amendment unconstitutional in *Lake Shore Auto Parts Co.* v. *Korzen,* 49 Ill. 2d 137, 273 N. E. 2d 592 (1971). We granted certiorari, 405 U. S. 1039 (1972), and, pending disposition of the case here, Illinois enacted a statute providing for the collection of the disputed taxes and the placement of the receipts in escrow. Ill. Rev. Stat., ch. 120, ¶ 676.01 (1979). Hillsboro paid the taxes for its shareholders in 1972, taking the deduction permitted by § 164(e), and the authorities placed the receipts in escrow. This Court upheld the state constitutional amendment in *Lehnhausen* v. *Lake Shore Auto Parts Co.,* 410 U. S. 356 (1973). Accordingly, in 1973 the County Treasurer refunded the amounts in escrow that were attributable to shares held by individuals, along with accrued interest. The Illinois courts held that the refunds belonged to the shareholders rather than to the banks. See *Bank & Trust Co. of Arlington Heights* v. *Cullerton,* 25 Ill. App. 3d 721, 726, 324 N. E.

---

[1] Section 164(e) provides:

"Where a corporation pays a tax imposed on a shareholder on his interest as a shareholder, and where the shareholder does not reimburse the corporation, then—

"(1) the deduction allowed by subsection (a) shall be allowed to the corporation; and

"(2) no deduction shall be allowed the shareholder for such tax."

Subsection (a) provides, in part:

"Except as otherwise provided in this section, the following taxes shall be allowed as a deduction for the taxable year within which paid or accrued:

. . . . .

"(2) State and local personal property taxes."

2d 29, 32 (1975) (alternative holding); *Lincoln National Bank* v. *Cullerton*, 18 Ill. App. 3d 953, 310 N. E. 2d 845 (1974). Without consulting Hillsboro, the Treasurer refunded the amounts directly to the individual shareholders. On its return for 1973, Hillsboro recognized no income from this sequence of events.[2] The Commissioner assessed a deficiency against Hillsboro, requiring it to include as income the amount paid its shareholders from the escrow. Hillsboro sought a redetermination in the Tax Court, which held that the refund of the taxes, but not the payment of accrued interest, was includible in Hillsboro's income. On appeal, relying on its earlier decision in *First Trust and Savings Bank of Taylorville* v. *United States*, 614 F. 2d 1142 (1980), the Court of Appeals for the Seventh Circuit affirmed. 641 F. 2d 529, 531 (1981).

In No. 81–930, *United States* v. *Bliss Dairy, Inc.*, the respondent, Bliss Dairy, Inc., was a closely held corporation engaged in the business of operating a dairy. As a cash basis taxpayer, in the taxable year ending June 30, 1973, it deducted upon purchase the full cost of the cattle feed purchased for use in its operations, as permitted by § 162 of the Internal Revenue Code, 26 U. S. C. § 162.[3] A substantial portion of the feed was still on hand at the end of the taxable year. On July 2, 1973, two days into the next taxable year, Bliss adopted a plan of liquidation, and, during the month of July, it distributed its assets, including the remaining cattle feed, to the shareholders. Relying on § 336, which shields the corporation from the recognition of gain on the distribu-

---

[2] Although the returns of the shareholders of the bank are not before us, the Commissioner explained that they were required to recognize the refund as income. See 641 F. 2d 529, 533, and n. 4 (CA7 1981) (Pell, J., dissenting).

[3] Section 162(a) provides in relevant part:

"There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business . . . ."

tion of property to its shareholders on liquidation,[4] Bliss reported no income on the transaction. The shareholders continued to operate the dairy business in noncorporate form. They filed an election under § 333 to limit the gain recognized by them on the liquidation,[5] and they therefore calculated their basis in the assets received in the distribution as pro-

---

[4] Section 336 provides:

"Except as provided in subsection (b) of this section and in section 453B (relating to disposition of installment obligations), no gain or loss shall be recognized to a corporation on the distribution of property in partial or complete liquidation." 26 U. S. C. § 336 (1976 ed., Supp. V).

[5] Section 333 provides, in relevant part:

"(a) In the case of property distributed in complete liquidation of a domestic corporation . . . , if—

"(1) the liquidation is made in pursuance of a plan of liquidation adopted, and

"(2) the distribution is in complete cancellation or redemption of all the stock, and the transfer of all the property under the liquidation occurs within some one calendar month,

"then in the case of each qualified electing shareholder . . . gain on the shares owned by him at the time of the adoption of the plan of liquidation shall be recognized only to the extent provided in subsections (e) and (f).

.　　　.　　　.　　　.　　　.

"(e) In the case of a qualified electing shareholder other than a corporation—

"(1) there shall be recognized, and treated as a dividend, so much of the gain as is not in excess of his ratable share of the earnings and profits of the corporation accumulated after February 28, 1913, such earnings and profits to be determined as of the close of the month in which the transfer in liquidation occurred under subsection (a)(2), but without diminution by reason of distributions made during such month; but by including in the computation thereof all amounts accrued up to the date on which the transfer of all the property under the liquidation is completed; and

"(2) there shall be recognized, and treated as short-term or long-term capital gain, as the case may be, so much of the remainder of the gain as is not in excess of the amount by which the value of that portion of the assets received by him which consists of money, or of stock or securities acquired by the corporation after December 31, 1953, exceeds his ratable share of such earnings and profits."

vided in § 334(c).[6]   Under that provision, their basis in the assets was their basis in their stock in the liquidated corporation, decreased by the amount of money received, and increased by the amount of gain recognized on the transaction. They then allocated that total basis over the assets, as provided in the regulations, Treas. Reg. § 1.334–2, 26 CFR § 1.334–2 (1982), presumably taking a basis greater than zero in the feed, although the amount of the shareholders' basis is not in the record.   They in turn deducted their basis in the feed as an expense of doing business under § 162.   On audit, the Commissioner challenged the corporation's treatment of the transaction, asserting that Bliss should have taken into income the value of the grain distributed to the shareholders. He therefore increased Bliss' income by $60,000.   Bliss paid the resulting assessment and sued for a refund in the District Court for the District of Arizona, where it was stipulated that the grain had a value of $56,565, see Pretrial Order, at 3. Relying on *Commissioner* v. *South Lake Farms, Inc.*, 324 F. 2d 837 (CA9 1963), the District Court rendered a judgment in favor of Bliss.   While recognizing authority to the contrary, *Tennessee-Carolina Transportation, Inc.* v. *Commissioner*, 582 F. 2d 378 (CA6 1978), cert. denied, 440 U. S. 909 (1979), the Court of Appeals saw *South Lake Farms* as controlling and affirmed.   645 F. 2d 19 (CA9 1981) *(per curiam)*.

---

[6] Section 334(c) provides:

"If—

"(1) property was acquired by a shareholder in the liquidation of a corporation in cancellation or redemption of stock, and

"(2) with respect to such acquisition—

"(A) gain was realized, but

"(B) as the result of an election made by the shareholder under section 333, the extent to which gain was recognized was determined under section 333,

"then the basis shall be the same as the basis of such stock cancelled or redeemed in the liquidation, decreased in the amount of any money received by the shareholder, and increased in the amount of gain recognized to him."

## II

The Government[7] in each case relies solely on the tax benefit rule—a judicially developed principle[8] that allays some of the inflexibilities of the annual accounting system. An annual accounting system is a practical necessity if the federal income tax is to produce revenue ascertainable and payable at regular intervals. *Burnet* v. *Sanford & Brooks Co.*, 282 U. S. 359, 365 (1931). Nevertheless, strict adherence to an annual accounting system would create transactional inequities. Often an apparently completed transaction will reopen unexpectedly in a subsequent tax year, rendering the initial reporting improper. For instance, if a taxpayer held a note that became apparently uncollectible early in the taxable year, but the debtor made an unexpected financial recovery before the close of the year and paid the debt, the transaction would have no tax consequences for the taxpayer, for the repayment of the principal would be recovery of capital. If, however, the debtor's financial recovery and the resulting repayment took place after the close of the taxable year, the taxpayer would have a deduction for the apparently bad debt in the first year under § 166(a) of the Code, 26 U. S. C. § 166(a). Without the tax benefit rule, the repayment in the second year, representing a return of capital, would not be taxable. The second transaction, then, although economically identical to the first, could, because of the differences in accounting, yield drastically different tax consequences. The Government, by allowing a deduction that it could not have known to be improper at the time, would be foreclosed[9]

---

[7] In No. 81–485, the Solicitor General represents the Commissioner of Internal Revenue, while in No. 81–930, he represents the United States. We refer to the Commissioner and the United States collectively as "the Government."

[8] Although the rule originated in the courts, it has the implicit approval of Congress, which enacted 26 U. S. C. § 111 as a limitation on the rule. See n. 12, *infra*.

[9] A rule analogous to the tax benefit rule protects the taxpayer who is required to report income received in one year under claim of right that he

from recouping any of the tax saved because of the improper deduction.[10] Recognizing and seeking to avoid the possible distortions of income,[11] the courts have long required the

later ends up repaying. Under that rule, he is allowed a deduction in the subsequent year. See generally 26 U. S. C. § 1341; 1 B. Bittker, Federal Taxation of Income, Estates and Gifts ¶ 6.3 (1981).

[10] When the event proving the deduction improper occurs after the close of the taxable year, even if the statute of limitations has not run, the Commissioner's proper remedy is to invoke the tax benefit rule and require inclusion in the later year rather than to reopen the earlier year. See *Lexmont Corp.* v. *Commissioner,* 20 T. C. 185 (1953); *South Dakota Concrete Products Co.* v. *Commissioner,* 26 B. T. A. 1429, 1432 (1932); 1 J. Mertens, Law of Federal Income Taxation § 7.34 (J. Doheny rev. ed. 1981); Bittker & Kanner, The Tax Benefit Rule, 26 UCLA L. Rev. 265, 266 (1978) (hereinafter Bittker & Kanner).

Much of JUSTICE BLACKMUN's dissent takes issue with this well-settled rule. The inclusion of the income in the year of the deductions by amending the returns for that year is not before us in these cases, for none of the parties has suggested such a result, no doubt because the rule is so settled. It is not at all clear what would happen on the remand that JUSTICE BLACKMUN desires. Neither taxpayer has ever sought to file an amended return. The statute of limitations has now run on the years to which the dissent would attribute the income, § 6501(a), and we have no indication in the record that the Government has held those years open for any other reason.

Even if the question were before us, we could not accept the view of JUSTICE BLACKMUN's dissent. It is, of course, true that the tax benefit rule is not a precise way of dealing with the transactional inequities that occur as a result of the annual accounting system, *post,* at 423, 426. See n. 12, *infra.* JUSTICE BLACKMUN's approach, however, does not eliminate the problem; it only multiplies the number of rules. If the statute of limitations has run on the earlier year, the dissent recognizes that the rule that we now apply must apply. *Post,* at 425. Thus, under the proposed scheme, the only difference is that, if the inconsistent event fortuitously occurs between the end of the year of the deduction and the running of the statute of limitations, the Commissioner must reopen the earlier year or permit an amended return even though it is settled that the acceptance of such a return after the date for filing a return is not covered by statute but within the discretion of the Commissioner. See, *e. g., Koch* v. *Alexander,* 561 F. 2d 1115 (CA4 1977) *(per curiam); Miskovsky* v. *United States,* 414

taxpayer to recognize the repayment in the second year as income. See, *e. g.*, *Estate of Block* v. *Commissioner*, 39 B. T. A. 338 (1939), aff'd *sub nom. Union Trust Co.* v. *Commissioner*, 111 F. 2d 60 (CA7), cert. denied, 311 U. S. 658 (1940); *South Dakota Concrete Products Co.* v. *Commis-*

---

F. 2d 954 (CA3 1969). In any other situation, the income must be recognized in the later year. Surely a single rule covering all situations would be preferable to several rules that do not alleviate any of the disadvantages of the single rule.

A second flaw in JUSTICE BLACKMUN's approach lies in his assertion that the practice he proposes is like any correction made after audit. Changes on audit reflect the proper tax treatment of items under the facts as they were known at the end of the taxable year. The tax benefit rule is addressed to a different problem—that of events that occur *after* the close of the taxable year.

In any event, whatever the merits of amending the return of the year of the improper deduction might originally have been, we think it too late in the day to change the rule. Neither the judicial origins of the rule nor the subsequent codification permits the approach suggested by JUSTICE BLACKMUN.

The dissent suggests that the reason that the early cases expounding the tax benefit rule required inclusion in the later year was that the statute of limitations barred adjustment in the earlier year. *Post,* at 423–424, n. That suggestion simply does not reflect the cases cited. In *Burnet* v. *Sanford & Brooks Co.,* 282 U. S. 359 (1931), the judgment of the Court of Appeals reflected JUSTICE BLACKMUN's approach, holding that the amount recovered in the later year was not income in that year but that the taxpayer had to amend its returns for the years of the deductions. *Id.,* at 362. This Court reversed, stating: "That the recovery made by respondent in 1920 was gross income *for that year . . .* cannot, we think, be doubted." *Id.,* at 363. (Emphasis added.) Neither does *Healy* v. *Commissioner,* 345 U. S. 278 (1953), a case dealing with income received under claim of right, provide any support for this novel theory. On the contrary, the Court's discussion of the statute of limitations, cited by the dissent, in context, is as follows:

"A rule which required that the adjustment be made in the earlier year of receipt instead of the later year of repayment would generally be unfavorable to taxpayers, for the statute of limitations would frequently bar any adjustment of the tax liability for the earlier year. Congress has enacted an annual accounting system under which income is counted up at the

*sioner*, 26 B. T. A. 1429 (1932); Plumb, The Tax Benefit Rule Today, 57 Harv. L. Rev., 129, 176, 178, and n. 172 (1943) (hereinafter Plumb).[12]

end of each year. It would be disruptive of an orderly collection of the revenue to rule that the accounting must be done over again to reflect events occurring after the year for which the accounting is made, and would violate the spirit of the annual accounting system." *Id.*, at 284–285 (footnote omitted).

Even the earliest cases, then, reflect the currently accepted view of the tax benefit rule.

Further, § 111, the partial codification of the tax benefit rule, see n. 8, *supra*, contradicts JUSTICE BLACKMUN's view. It provides that gross income for a year does not include a specified portion of a recovery of amounts earlier deducted, implying that the remainder of the recovery *is* to be included in gross income for that year. See, *e. g.*, S. Rep. No. 830, 88th Cong., 2d Sess., 100 (1964); S. Rep. No. 1631, 77th Cong., 2d Sess., 79 (1942). Even if the judicial origins of the rule supported JUSTICE BLACKMUN, we would still be obliged to bow to the will of Congress.

[11] As the rule developed, a number of theories supported taxation in the later year. One explained that the taxpayer who had taken the deduction "consented" to "return" it if events proved him not entitled to it, *e. g.*, *Philadelphia National Bank* v. *Rothensies*, 43 F. Supp. 923, 925 (ED Pa. 1942), while another explained that the deduction offset income in the earlier year, which became "latent" income that might be recaptured, *e. g.*, *National Bank of Commerce* v. *Commissioner*, 115 F. 2d 875, 876–877 (CA9 1940); Lassen, The Tax Benefit Rule and Related Problems, 20 Taxes 473, 476 (1942). Still a third view maintained that the later recognition of income was a balancing entry. *E. g.*, *South Dakota Concrete Products Co.* v. *Commissioner*, 26 B. T. A. 1429, 1431 (1932). All these views reflected that the initial accounting for the item must be corrected to present a true picture of income. While annual accounting precludes reopening the earlier year, it does not prevent a less precise correction—far superior to none—in the current year, analogous to the practice of financial accountants. See W. Meigs, A. Mosich, C. Johnson, & T. Keller, Intermediate Accounting 109 (3d ed. 1974). This concern with more accurate measurement of income underlies the tax benefit rule and always has.

[12] Even this rule did not create complete transactional equivalence. In the second version of the transaction discussed in the text, the taxpayer might have realized no benefit from the deduction, if, for instance, he had no taxable income for that year. Application of the tax benefit rule as originally developed would require the taxpayer to recognize income on the repayment, so that the net result of the collection of the principal amount

The taxpayers and the Government in these cases propose different formulations of the tax benefit rule. The taxpayers contend that the rule requires the inclusion of amounts *recovered* in later years, and they do not view the events in these cases as "recoveries." The Government, on the other hand, urges that the tax benefit rule requires the inclusion of amounts previously deducted if later events are inconsistent with the deductions; it insists that no "recovery" is necessary to the application of the rule. Further, it asserts that the events in these cases are inconsistent with the deductions taken by the taxpayers. We are not in complete agreement with either view.

An examination of the purpose and accepted applications of the tax benefit rule reveals that a "recovery" will not always be necessary to invoke the tax benefit rule. The purpose of the rule is not simply to tax "recoveries." On the contrary, it is to approximate the results produced by a tax system based on transactional rather than annual accounting. See generally Bittker & Kanner 270; Byrne, The Tax Benefit Rule as Applied to Corporate Liquidations and Contributions to Capital: Recent Developments, 56 Notre Dame Law. 215, 221, 232, (1980); Tye, The Tax Benefit Doctrine Reexamined, 3 Tax L. Rev. 329 (1948) (hereinafter Tye). It has long been accepted that a taxpayer using accrual accounting who accrues and deducts an expense in a tax year before it becomes payable and who for some reason eventually does not have to

of the debt would be recognition of income. Similarly, the tax rates might change between the two years, so that a deduction and an inclusion, though equal in amount, would not produce exactly offsetting tax consequences. Congress enacted § 111 to deal with part of this problem. Although a change in the rates may still lead to differences in taxes due, see *Alice Phelan Sullivan Corp.* v. *United States,* 180 Ct. Cl. 659, 381 F. 2d 399 (1967), § 111 provides that the taxpayer can exclude from income the amount that did not give rise to some tax benefit. See *Dobson* v. *Commissioner,* 320 U. S. 489, 505–506 (1943). This exclusionary rule and the inclusionary rule described in the text are generally known together as the tax benefit rule. It is the inclusionary aspect of the rule with which we are currently concerned.

pay the liability must then take into income the amount of the expense earlier deducted. See, *e. g., Mayfair Minerals, Inc.* v. *Commissioner,* 456 F. 2d 622 (CA5 1972) *(per curiam); Bear Manufacturing Co.* v. *United States,* 430 F. 2d 152 (CA7 1970), cert. denied, 400 U. S. 1021 (1971); *Haynsworth* v. *Commissioner,* 68 T. C. 703 (1977), affirmance order, 609 F. 2d 1007 (CA5 1979); *G. M. Standifer Construction Corp.* v. *Commissioner,* 30 B. T. A. 184, 186–187 (1934), petition for review dism'd, 78 F. 2d 285 (CA9 1935). The bookkeeping entry canceling the liability, though it increases the balance sheet net worth of the taxpayer, does not fit within any ordinary definition of "recovery." [13] Thus, the taxpayers' formulation of the rule neither serves the purposes of the rule nor accurately reflects the cases that establish the rule. Further, the taxpayers' proposal would introduce an undesirable formalism into the application of the tax benefit rule. Lower courts have been able to stretch the definition of "recovery" to include a great variety of events. For instance, in cases of corporate liquidations, courts have viewed the corporation's receipt of its own stock as a "recovery," reasoning that, even though the instant that the corporation receives the stock it becomes worthless, the stock has value as it is turned over to the corporation, and that ephemeral value represents a recovery for the corporation.

---

[13] See, *e. g.,* Bittker & Kanner 267; cf. Zysman, Income Derived from the Recovery of Deductions, 19 Taxes 29, 30 (1941) (We are "not concerned with a theoretical or pure economic concept of income, but with gross income within the meaning of the statute").

Although JUSTICE STEVENS insists that this situation falls within the standard meaning of "recovery," it does so only in the sense that an increase in balance sheet net worth is to be considered a recovery. *Post,* at 416–417, n. 26. But in *Bliss,* JUSTICE STEVENS asserts that there is no recovery. There, the corporation's balance sheet shows zero as the historic cost of the grain on hand, because the corporation expensed the asset upon acquisition. At the date of liquidation, the historic cost of the grain on hand was in fact greater than zero, and an accurate balance sheet would have reflected an asset account balance greater than zero. The necessary adjustment thus reflects an increase in balance sheet net worth.

See, *e. g., Tennessee-Carolina Transportation, Inc.* v. *Commissioner*, 582 F. 2d, at 382 (alternative holding). Or, payment to another party may be imputed to the taxpayer, giving rise to a recovery. See *First Trust and Savings Bank of Taylorville* v. *United States*, 614 F. 2d, at 1146 (alternative holding). Imposition of a requirement that there be a recovery would, in many cases, simply require the Government to cast its argument in different and unnatural terminology, without adding anything to the analysis.[14]

The basic purpose of the tax benefit rule is to achieve rough transactional parity in tax, see n. 12, *supra*, and to protect the Government and the taxpayer from the adverse effects of reporting a transaction on the basis of assumptions that an event in a subsequent year proves to have been erroneous. Such an event, unforeseen at the time of an earlier deduction, may in many cases require the application of the tax benefit rule. We do not, however, agree that this consequence invariably follows. Not every unforeseen event will require the taxpayer to report income in the amount of his earlier deduction. On the contrary, the tax benefit rule will "cancel out" an earlier deduction only when a careful examination shows that the later event is indeed fundamentally inconsistent with the premise on which the deduction was initially based.[15] That is, if that event had occurred within the

---

[14] Despite JUSTICE STEVENS' assertion that *Tennessee-Carolina* was wrong, *post*, at 417, n. 26, the case fits what seems to be his definition of a recovery—an enhancement of the taxpayer's wealth—for the corporation in *Tennessee-Carolina* received stock worth more than the balance sheet book value of its assets. See n. 13, *supra*. Thus we disagree with the assertion that the recovery rule is a bright-line rule easily applied.

[15] JUSTICE STEVENS accuses us of creating confusion at this point in the analysis by requiring the courts to distinguish "inconsistent events" from "fundamentally inconsistent events." *Post*, at 418. That line is not the line we draw; rather, we draw the line between merely unexpected events and inconsistent events.

This approach differs from that proposed by the Government in that the Government has not attempted to explain why two events are inconsistent. Apparently, in the Government's view, any unexpected event is inconsistent with an earlier deduction. That view we cannot accept.

same taxable year, it would have foreclosed the deduction.[16] In some cases, a subsequent recovery by the taxpayer will be the only event that would be fundamentally inconsistent with the provision granting the deduction. In such a case, only actual recovery by the taxpayer would justify application of the tax benefit rule. For example, if a calendar-year taxpayer made a rental payment on December 15 for a 30-day lease deductible in the current year under § 162(a)(3), see Treas. Reg. § 1.461–1(a)(1), 26 CFR § 1.461–1(a)(1) (1982); e. g., *Zaninovich* v. *Commissioner*, 616 F. 2d 429 (CA9 1980),[17] the tax benefit rule would not require the recognition

---

[16] JUSTICE STEVENS apparently disagrees with this rule, for, although he concurs in the result in *Hillsboro*, he asserts that the events there would have resulted in denial of the deduction had they all occurred in one year. *Post*, at 418. We find it difficult to believe that Congress placed such a premium on having a transaction straddle two tax years.

[17] JUSTICE STEVENS questions whether this amount was properly deductible under § 162(a)(3) and seems to suggest that if it was, Congress meant the deduction to be irrevocable. *Post*, at 415–416, n. 25. It is clear that § 162(a)(3) permits the deduction of prepaid expenses that will benefit the taxpayer for a short time into the next taxable year, as in our example, rather than benefiting the taxpayer substantially beyond the taxable year. See generally 1 B. Bittker, *supra* n. 9, ¶ 20.4.1.

The dissent's view that the preferable approach is to scrutinize the deduction more carefully in the year it is taken ignores two basic problems. First, reasons unrelated to the certainty that the taxpayer will eventually consume the asset as expected often enter into the decision when to allow the deduction. For instance, the desire to save taxpayers the burden of careful allocation of relatively small expenditures favors the allowance of the entire deduction in a single year of some business expenditures attributable to operations after the close of the taxable year. See generally *ibid.* Second, we simply cannot predict the future, no matter how carefully we scrutinize the deduction in the earlier year. For instance, in the case of the bad debt that is eventually repaid, we already require that the debt be apparently worthless in the year of deduction, see § 166(a)(1), but we often find that the future does not conform to earlier perceptions, and the taxpayer collects the debt. Then, "the deductions are practical necessities due to our inability to read the future, and the inclusion of the recovery in income is necessary to offset the deduction." *South Dakota Concrete Products Co.* v. *Commissioner*, 26 B. T. A., at 1432.

of income if the leased premises were destroyed by fire on January 10. The resulting inability of the taxpayer to occupy the building would be an event not fundamentally inconsistent with his prior deduction as an ordinary and necessary business expense under § 162(a). The loss is attributable to the business [18] and therefore is consistent with the deduction of the rental payment as an ordinary and necessary business expense. On the other hand, had the premises not burned and, in January, the taxpayer decided to use them to house his family rather than to continue the operation of his business, he would have converted the leasehold to personal use. This would be an event fundamentally inconsistent with the business use on which the deduction was based. [19] In the case of the fire, only if the lessor—by virtue of some provision in the lease—had refunded the rental payment would the taxpayer be required under the tax benefit rule to recognize income on the subsequent destruction of the building. In other words, the subsequent recovery of the previously deducted rental payment would be the only event inconsistent with the provision allowing the deduction. It therefore is evident that the tax benefit rule must be applied on a case-by-case basis. A court must consider the facts and circumstances of each case in the light of the purpose and function of the provisions granting the deductions.

When the later event takes place in the context of a nonrecognition provision of the Code, there will be an inherent tension between the tax benefit rule and the nonrecognition provision. See *Putoma Corp.* v. *Commissioner*, 601 F. 2d 734, 742 (CA5 1979); *id.*, at 751 (Rubin, J., dissenting); cf. *Helvering* v. *American Dental Co.*, 318 U. S. 322 (1943) (ten-

---

[18] The loss is properly attributable to the business because the acceptance of the risk of loss is a reasonable business judgment that the courts ordinarily will not question. See *Welch* v. *Helvering*, 290 U. S. 111, 113 (1933); 1 B. Bittker, *supra* n. 9, ¶ 20.3.2.

[19] See 1 B. Bittker, *supra* n. 9, ¶ 20.2.2 ("[F]ood and shelter are quintessential nondeductible personal expenses"). See also *infra*, at 395–396.

sion between exclusion of gifts from income and treatment of cancellation of indebtedness as income). We cannot resolve that tension with a blanket rule that the tax benefit rule will always prevail. Instead, we must focus on the particular provisions of the Code at issue in any case.[20]

The formulation that we endorse today follows clearly from the long development of the tax benefit rule. JUSTICE STEVENS' assertion that there is no suggestion in the early cases or from the early commentators that the rule could ever be applied in any case that did not involve a physical recovery, *post*, at 406–408, is incorrect. The early cases frequently framed the rule in terms consistent with our view and irreconcilable with that of the dissent. See *Barnett* v. *Com-*

---

[20] An unreserved endorsement of the Government's formulation might dictate the results in a broad range of cases not before us. See, *e. g.*, Brief for United States in No. 81–930 and for Respondent in No. 81–485, p. 20; Reply Brief for Petitioner in No. 81–485, p. 12; Tr. of Oral Arg. 33. For instance, the Government's position implies that an individual proprietor who makes a gift of an expensed asset must recognize the amount of the expense as income, but cf. *Campbell* v. *Prothro*, 209 F. 2d 331, 335 (CA5 1954). See generally 2A J. Rabkin & M. Johnson, Federal Income, Gift and Estate Taxation § 6.01(3) (1982) (discussing Commissioner's treatment of gifts of expensed assets). Similarly, the Government's view suggests the conclusion that one who dies and leaves an expensed asset to his heirs would, in his last return, recognize income in the amount of the earlier deduction. Our decision in the cases before us now, however, will not determine the outcome in these other situations; it will only demonstrate the proper analysis. Those cases will require consideration of the treatment of gifts and legacies as well as §§ 1245(b)(1), (2), and 1250(d)(1), (2), which are a partial codification of the tax benefit rule, see O'Hare, Statutory Nonrecognition of Income and the Overriding Principle of the Tax Benefit Rule in the Taxation of Corporations and Shareholders, 27 Tax L. Rev. 215, 216 (1972), and which exempt dispositions by gift and transfers at death from the operation of the general depreciation recapture rules. Although there may be an inconsistent event in the personal use of an expensed asset, that event occurs in the context of a nonrecognition rule, see, *e. g.*, *Campbell* v. *Prothro*, *supra*, at 336; 1 B. Bittker, *supra* n. 9, ¶ 5.21, and resolution of these cases would require a determination whether the nonrecognition rule or the tax benefit rule prevails.

*missioner*, 39 B. T. A. 864, 867 (1939) ("Finally, the present case is analogous to a number of others, where . . . [w]hen some event occurs which is *inconsistent* with a deduction taken in a prior year, adjustment may have to be made by reporting a balancing item in income for the year in which the change occurs") (emphasis added); *Estate of Block* v. *Commissioner*, 39 B. T. A., at 341 ("When recovery *or some other event which is inconsistent* with what has been done in the past occurs, adjustment must be made in reporting income for the year in which the change occurs") (emphasis added); *South Dakota Concrete Products Co.* v. *Commissioner*, 26 B. T. A., at 1432 ("[W]hen an *adjustment* occurs which is *inconsistent* with what has been done in the past in the determination of tax liability, the adjustment should be reflected in reporting income for the year in which it occurs") (emphasis added).[21] The reliance of the dissent on the early commentators is equally misplaced, for the articles cited in the dissent, like the early cases, often stated the rule in terms of inconsistent events.[22]

---

[21] JUSTICE STEVENS' attempt to discount the explicit statement in *Estate of Block* that inconsistent events would trigger the recognition of income, *post*, at 408, n. 9, is singularly unpersuasive. The Board of Tax Appeals used the word "recovery" later in the opinion because it was faced with a recovery in that case, not because it meant to repudiate hastily its discussion in the same opinion of the general rule. Similarly, the mere assertion that the broad formulation in *Barnett* followed a discussion of a Treasury Regulation, *post*, at 408, n. 10, does not support the view of the dissent that the concept of inconsistent events represents a break with the early cases.

[22] "The rule requiring taxation of income from the recovery or *cancellation* of items previously deducted is a remedial expedient, designed to prevent the unjust enrichment of a taxpayer and to offset the benefit derived from a deduction to which, *in the light of subsequent events*, the taxpayer was not entitled." Plumb 176 (emphasis added). See also *id.*, at 131, 178.

"In a few words, the basic idea of the Tax Benefit Rule is this: If a taxpayer has derived a benefit from a deduction by reducing his taxable income in the year of deduction, he must declare as taxable income any recovery *or other change of his status* which—*ex nunc*—makes the original

Finally, JUSTICE STEVENS' dissent relies heavily on the codification in § 111 of the exclusionary aspect of the tax benefit rule, which requires the taxpayer to include in income only the amount of the deduction that gave rise to a tax benefit, see n. 12, *supra*. That provision does, as the dissent observes, speak of a "recovery." By its terms, it only applies to bad debts, taxes, and delinquency amounts. Yet this Court has held, *Dobson* v. *Commissioner*, 320 U. S. 489, 505–506 (1943), and it has always been accepted since, [23] that § 111 does not *limit* the application of the exclusionary aspect of the tax benefit rule. On the contrary, it lists a few applications and represents a general endorsement of the exclusionary aspect of the tax benefit rule to other situations within the inclusionary part of the rule. The failure to mention inconsistent events in § 111 no more suggests that they do not trigger the application of the tax benefit rule than the failure to mention the recovery of a capital loss suggests that it does not, see *Dobson, supra.*

JUSTICE STEVENS also suggests that we err in recognizing transactional equity as the reason for the tax benefit rule. It is difficult to understand why even the clearest recovery should be taxed if not for the concern with transactional equity, see *supra*, at 377. Nor does the concern with transactional equity entail a change in our approach to the annual accounting system. Although the tax system relies basically

---

deduction seem unjustified." Lassen, The Tax Benefit Rule and Related Problems, 20 Taxes 473 (1942) (emphasis added).

One author saw his subject—the recovery of deductions—as an example of the broader rule: "Sometimes a *subsequent event* reveals the income or deductions as reported by the taxpayer to be erroneous. Thus the unexpected recovery of a portion of an amount lost and already deducted reduces the loss as originally determined. There are even cases in which items apparently finally and accurately determined have to be adjusted *on account of a subsequent event.*" Zysman, Income Derived from the Recovery of Deductions, 19 Taxes 29 (1941) (emphasis added).

[23] See, *e. g.*, Bittker & Kanner 266; Tye 330; Plumb 144–145.

on annual accounting, see *Burnet* v. *Sanford & Brooks Co.*, 282 U. S., at 365, the tax benefit rule eliminates some of the distortions that would otherwise arise from such a system. See, *e. g.*, Bittker & Kanner 268–270; Tye 350; Plumb 178, and n. 172. The limited nature of the rule and its effect on the annual accounting principle bears repetition: *only* if the occurrence of the event in the earlier year would have resulted in the disallowance of the deduction can the Commissioner require a compensating recognition of income when the event occurs in the later year.[24]

Our approach today is consistent with our decision in *Nash* v. *United States*, 398 U. S. 1 (1970). There, we rejected the Government's argument that the tax benefit rule required a taxpayer who incorporated a partnership under § 351 to include in income the amount of the bad debt reserve of the

---

[24] JUSTICE STEVENS seems to fear that our approach to the annual accounting system is inconsistent with *Sanford & Brooks* in a way that will vest new power in the tax collector to ignore the annual accounting system. The fear is unfounded. In *Sanford & Brooks*, a taxpayer who had incurred a net loss on a long-term contract managed to recoup the loss in a lawsuit in a later year. The earlier net losses on the contract contributed to net losses for the business in most of the tax years during the performance of the contract. The Court rejected the taxpayer's contention that it should be able to exclude the award on the theory that the award offset the earlier net losses. This adherence to the annual accounting system is perfectly consistent with the approach we follow in the cases now before us. In situations implicating the tax benefit rule or the analogous doctrine permitting the taxpayer to take a deduction when income recognized earlier under a claim of right must be repaid, see n. 9, *supra*, the problem is that the taxpayer has mischaracterized some event. Either he has recognized income that eventually turns out not to be income, or he has taken a deduction that eventually turns out not to be a deduction. Neither of these problems arose in *Sanford & Brooks*. Instead, the problem there was that the taxpayer had properly deducted expenditures and was properly recognizing income but thought that the two should have been matched in the same year. The tax benefit rule does not permit the Commissioner or the taxpayer to rematch properly recognized income with properly deducted expenses; it merely permits a balancing entry when an apparently proper expense turns out to be improper.

partnership. The Government's theory was that, although § 351 provides that there will be no gain or loss on the transfer of assets to a controlled corporation in such a situation, the partnership had taken bad debt deductions to create the reserve, see § 166(c), and when the partnership terminated, it no longer needed the bad debt reserve. We noted that the receivables were transferred to the corporation along with the bad debt reserve. *Id.*, at 5, and n. 5. Not only was there no "recovery," *id.*, at 4, but there was no inconsistent event of any kind. That the fair market value of the receivables was equal to the face amount less the bad debt reserve, *ibid.*, reflected that the reserve, and the deductions that constituted it, were still an accurate estimate of the debts that would ultimately prove uncollectible, and the deduction was therefore completely consistent with the later transfer of the receivables to the incorporated business. See *Citizens' Acceptance Corp.* v. *United States*, 320 F. Supp. 798 (Del. 1971), rev'd on other grounds, 462 F. 2d 751 (CA3 1972); Rev. Rul. 78–279, 1978–2 Cum. Bull. 135; Rev. Rul. 78–278, 1978–2 Cum. Bull. 134; see generally O'Hare, Statutory Nonrecognition of Income and the Overriding Principle of the Tax Benefit Rule in the Taxation of Corporations and Shareholders, 27 Tax L. Rev. 215, 219–221 (1972).[25]

In the cases currently before us, then, we must undertake an examination of the particular provisions of the Code that govern these transactions to determine whether the deduc-

---

[25] JUSTICE STEVENS attempts to read our prior cases as somehow inconsistent with our approach here. *Nash* is the only case in which we have dealt with the inclusionary aspect of the tax benefit rule, and, as we have established, there was neither a recovery nor an inconsistent event in that case. In *Dobson* v. *Commissioner*, 320 U. S. 489 (1943), we considered the exclusionary aspect of the rule. That case involved a recovery that was clearly inconsistent with the deduction, and the only question was whether the deduction had created a benefit. The references to "recovery" in the opinion describe the case before the Court. They do not in any way impose general requirements for inclusion, as the dissent seems to suggest.

tions taken by the taxpayers were actually inconsistent with later events and whether specific nonrecognition provisions prevail over the principle of the tax benefit rule.[26]

## III

In *Hillsboro*, the key provision is § 164(e).[27] That section grants the corporation a deduction for taxes imposed on its shareholders but paid by the corporation. It also denies the shareholders any deduction for the tax. In this case, the Commissioner has argued that the refund of the taxes by the State to the shareholders is the equivalent of the payment of a dividend from Hillsboro to its shareholders. If Hillsboro does not recognize income in the amount of the earlier deduction, it will have deducted a dividend. Since the general structure of the corporate tax provisions does not permit deduction of dividends, the Commissioner concludes that the payment to the shareholders must be inconsistent with the original deduction and therefore requires the inclusion of the amount of the taxes as income under the tax benefit rule.

[26] It is worth noting that a holding requiring no recognition of income is not, as JUSTICE BLACKMUN's dissent suggests, a conclusion that the tax benefit rule "has no application to the situation presented." *Post*, at 422. As a general principle of tax law, the rule of course applies; it simply does not require the recognition of income.

[27] The Commissioner asserts also that Hillsboro deducted the taxes as a contested liability under § 461(f), and that the legislative history of § 461(f) shows that Congress intended that the tax benefit rule apply if a taxpayer successfully contested a liability deducted under § 461(f). We do not view this argument as in any way separate from the Commissioner's argument under § 164(e). Section 461(f) does not grant deductions of its own force; the expenditure must qualify as deductible in character under some other section. See Treas. Reg. § 1.461–2(a)(1)(iv), 26 CFR § 1.461–2(a)(1)(iv) (1982). If the expenditure does qualify independently as deductible, but, because it is contested, it lacks the certainty otherwise required for deduction, § 461(f) grants the deduction, on the condition that the tax benefit rule will apply. But for the tax benefit rule to apply, there must be some event that is inconsistent with the provision granting the deduction. The question here then remains whether the deduction is appropriate under § 164(e) or whether later events are inconsistent with that deduction.

In evaluating this argument, it is instructive to consider what the tax consequences of the payment of a shareholder tax by the corporation would be without § 164(e) and compare them to the consequences under § 164(e). Without § 164(e), the corporation would not be entitled to a deduction, for the tax is not imposed on it. See Treas. Reg. § 1.164–1(a), 26 CFR § 1.164–1(a) (1982); *Wisconsin Gas & Electric Co.* v. *United States*, 322 U. S. 526, 527–530 (1944). If the corporation has earnings and profits, the shareholder would have to recognize income in the amount of the taxes, because a payment by a corporation for the benefit of its shareholders is a constructive dividend. See §§ 301(c), 316(a); *e. g.*, *Ireland* v. *United States*, 621 F. 2d 731, 735 (CA5 1980); B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders ¶ 7.05 (4th ed. 1979). The shareholder, however, would be entitled to a deduction since the constructive dividend is used to satisfy his tax liability. § 164(a)(2). Thus, for the shareholder, the transaction would be a wash: he would recognize the amount of the tax as income,[28] but he would have an offsetting deduction for the tax. For the corporation, there would be no tax consequences, for the payment of a dividend gives rise to neither income nor a deduction. 26 U. S. C. § 311(a) (1976 ed., Supp. V).

Under § 164(e), the economics of the transaction of course remain unchanged: the corporation is still satisfying a liability of the shareholder and is therefore paying a constructive dividend. The tax consequences are, however, significantly different, at least for the corporation. The transaction is still a wash for the shareholder; although § 164(e) denies him the de-

---

[28] There would be an exception for a shareholder who had not yet earned $200 in interest and dividend income from his stock holdings in this and other corporations during the taxable year. He would be able to exclude up to $200 received in dividend and interest income for the year. See 26 U. S. C. §§ 116(a)(1), (b) (1976 ed., Supp. V). At the time of the Hillsboro transaction, the exclusion was $100. See 26 U. S. C. § 116(a).

duction to which he would otherwise be entitled, he need not recognize income on the constructive dividend, Treas. Reg. § 1.164–7, 26 CFR § 1.164–7 (1982). But the corporation is entitled to a deduction that would not otherwise be available. In other words, the only effect of § 164(e) is to permit the corporation to deduct a dividend. Thus, we cannot agree with the Commissioner that, simply because the events here give rise to a deductible dividend, they cannot be consistent with the deduction. In at least some circumstances, a deductible dividend is within the contemplation of the Code. The question we must answer is whether § 164(e) permits a deductible dividend in these circumstances—when the money, though initially paid into the state treasury, ultimately reaches the shareholder—or whether the deductible dividend is available, as the Commissioner urges, only when the money remains in the state treasury, as properly assessed and collected tax revenue.

Rephrased, our question now is whether Congress, in granting this special favor to corporations that paid dividends by satisfying the liability of their shareholders, was concerned with the *reason* the money was paid out by the corporation or with the *use* to which it was ultimately put. Since § 164(e) represents a break with the usual rules governing corporate distributions, the structure of the Code does not provide any guidance on the reach of the provision. This Court has described the provision as "prompted by the plight of various banking corporations which paid and voluntarily absorbed the burden of certain local taxes imposed upon their shareholders, but were not permitted to deduct those payments from gross income." *Wisconsin Gas & Electric Co.* v. *United States, supra,* at 531 (footnote omitted). The section, in substantially similar form, has been part of the Code since the Revenue Act of 1921, 42 Stat. 227. The provision was added by the Senate, but its Committee Report merely mentions the deduction without discussing it, see S. Rep. No. 275, 67th Cong., 1st Sess., 19 (1921). The only discussion of

the provision appears to be that between Dr. T. S. Adams and Senator Smoot at the Senate hearings. Dr. Adams' statement explains why the States imposed the property tax on the shareholders and collected it from the banks, but it does not cast much light on the reason for the deduction. Hearings on H. R. 8245 before the Committee on Finance, 67th Cong., 1st Sess., 250–251 (1921) (statement of Dr. T. S. Adams, tax advisor, Treasury Department). Senator Smoot's response, however, is more revealing:

> "I have been a director in a bank . . . for over 20 years. They have paid that tax ever since I have owned a share of stock in the bank. . . . I know nothing about it. I do not take 1 cent of credit for deductions, and the banks are entitled to it. *They pay it out.*" *Id.*, at 251 (emphasis added).

The *payment* by the corporations of a liability that Congress knew was not a tax imposed on them[29] gave rise to the entitlement to a deduction; Congress was unconcerned that the corporations took a deduction for amounts that did not satisfy their tax liability. It apparently perceived the shareholders and the corporations as independent of one another, each "know[ing] nothing about" the payments by the other. In those circumstances, it is difficult to conclude that Congress intended that the corporation have no deduction if the State turned the tax revenues over to these independent parties. We conclude that the purpose of § 164(e) was to provide relief for corporations making these payments, and the focus of Congress was on the act of payment rather than on the ultimate use of the funds by the State. As long as the payment itself was not negated by a refund to the corporation, the change in character of the funds in the hands of the

---

[29] Dr. Adams testified repeatedly that the banks paid the tax "voluntarily." Hearings on H. R. 8245 before the Committee on Finance, 67th Cong., 1st Sess., 250 (1921).

State does not require the corporation to recognize income, and we reverse the judgment below.[30]

## IV

The problem in *Bliss* is more complicated. Bliss took a deduction under § 162(a), so we must begin by examining that provision. Section 162(a) permits a deduction for the "ordinary and necessary expenses" of carrying on a trade or business. The deduction is predicated on the consumption of the asset in the trade or business. See Treas. Reg. § 1.162–3, 26 CFR § 1.162–3 (1982) ("Taxpayers . . . should include in expenses the charges for materials and supplies only in the amount that they are *actually consumed and used in operation* in the taxable year . . .") (emphasis added). If the taxpayer later sells the asset rather than consuming it in furtherance of his trade or business, it is quite clear that he would lose his deduction, for the basis of the asset would be zero, see, *e. g., Spitalny* v. *United States,* 430 F. 2d 195 (CA9 1970), so he would recognize the full amount of the proceeds on sale as gain. See §§ 1001(a), (c). In general, if the taxpayer converts the expensed asset to some other, nonbusiness use, that action is inconsistent with his earlier deduction, and the tax benefit rule would require inclusion in income of the amount of the unwarranted deduction. That nonbusiness use is inconsistent with a deduction for an ordinary and necessary business expense is clear from an examination of the Code. While § 162(a) permits a deduction for ordinary and necessary business expenses, § 262 explicitly

[30] Our examination of the legislative history thus leads us to reject JUSTICE BLACKMUN's unsupported suggestion that Congress focused on the payment of a tax. *Post,* at 422. The theory he suggests leads to the conclusion that, even if the State had not refunded the taxes, the bank would not have been entitled to the deduction, because it had not paid a "tax." It is difficult to believe that the Congress that acted to alleviate "the plight of various banking corporations which paid and voluntarily absorbed the burden," *Wisconsin Gas & Electric Co.* v. *United States,* 322 U. S. 526, 531 (1944), intended the result suggested by the dissent.

denies a deduction for personal expenses. In the 1916 Act, the two provisions were a single section. See § 5(a)(First), 39 Stat. 756. The provision has been uniformly interpreted as providing a deduction only for those expenses attributable to the business of the taxpayer. See, e. g., *Kornhauser* v. *United States*, 276 U. S. 145 (1928); Hearings on Proposed Revision of Revenue Laws before the Subcommittee of the House Committee on Ways and Means, 75th Cong., 3d Sess., 54 (1938) ("a taxpayer should be granted a reasonable deduction for the direct expenses he has incurred *in connection with his income*") (emphasis added); see generally, 1 Bittker, *supra* n. 9, ¶ 20.2. Thus, if a corporation turns expensed assets to the analog of personal consumption, as Bliss did here—distribution to shareholders[31]—it would seem that it should take into income the amount of the earlier deduction.[32]

---

[31] "Paying the dividend was the enjoyment of [the corporate] income. A body corporate can be said to enjoy its income in no other way." *Williamson* v. *United States*, 155 Ct. Cl. 279, 289, 292 F. 2d 524, 530 (1961).

[32] JUSTICE STEVENS' dissent takes issue with this conclusion, characterizing the situation as identical to that in *Nash* v. *United States*, 398 U. S. 1 (1970), which he explains as a case in which we held that, although "a business asset matching a prior deduction . . . would not be used up . . . until it had passed to a different taxpayer," the transfer did not require the recognition of income. *Post*, at 415. What is misleading in this description is its failure to recognize that in *Nash* the prior deduction was reflected in the asset transferred because of the contra-asset account: uncollectible accounts. That contra-asset diminished the asset, see generally W. Meigs, A. Mosich, C. Johnson, & T. Keller, Intermediate Accounting 140–141 (3d ed. 1974), and was inseparable from it. Therefore, the transfer of the notes did not establish that they were worth their face value, and there was no inconsistent event.

In *Bliss*, the taxpayers took a deduction for an expense and credited the asset account. Unlike the debit to the expense account in *Nash*, the debit to the expense account did not reflect any economic decrease in the value of the asset. When the taxpayers transferred the asset, it became clear that the economic decrease would not take place in the hands of Bliss—and possibly never would occur.

To see the difference more clearly, consider the views of a third party contemplating purchasing the asset on hand in *Nash* and one contemplating

That conclusion, however, does not resolve this case, for the distribution by Bliss to its shareholders is governed by a provision of the Code that specifically shields the taxpayer from recognition of gain—§ 336. We must therefore proceed to inquire whether this is the sort of gain that goes unrecognized under § 336. Our examination of the background of § 336 and its place within the framework of tax law convinces us that it does not prevent the application of the tax benefit rule.[33]

Section 336 was enacted as part of the 1954 Code. It codified the doctrine of *General Utilities Co.* v. *Helvering,* 296 U. S. 200, 206 (1935), that a corporation does not recognize gain on the distribution of appreciated property to its shareholders. Before the enactment of the statutory provision,

---

purchasing the asset on hand in *Bliss.* In *Nash,* the purchaser would be willing to pay only the face amount of the receivables *less the amount in the contra-asset account*—the amount earlier deducted by the taxpayer—because that is all the purchaser could expect to realize on them. In other words, the deduction reflected a real decrease in the value of the asset. In *Bliss,* on the other hand, the purchaser would be happy to pay the value of the grain, *undiminished by the expense deducted by the taxpayer.* The deduction and the asset remain separable, and the taxpayer can transfer one without netting out the other.

[33] We are aware that Congress considered but failed to enact a bill amending §§ 1245 and 1250 to cover any deduction of the purchase price of property. H. R. 10936, 94th Cong., 1st Sess. (1975). That bill would have settled the question here, since it is clear that § 1245 overrides § 336. § 1245(a)(1); Treas. Reg. § 1.1245–6(b), 26 CFR § 1.1245–6(b) (1982). The failure to enact the bill does not suggest that Congress intended that deductions under § 162 not be subject to recapture. Both the House and Senate Committees reported favorably on the bill, S. Rep. No. 94–1346 (1976); H. R. Rep. No. 94–1350 (1976), the House passed it, and Congress adjourned without any action by the Senate. See Calendars of the United States House of Representatives and History of Legislation 174 (Final ed. 1977). The Reports suggest that Congress focused on disposition by sale and thought the income subject to recapture in any event, but possibly at capital gains rather than ordinary income rates. S. Rep. No. 94–1346, *supra,* at 2; H. R. Rep. No. 94–1350, *supra,* at 2. Given this background, we cannot draw any inference from the failure to enact the amendment.

the rule was expressed in the regulations, which provided that the corporation would not recognize gain or loss, "however [the assets] may have *appreciated or depreciated* in value since their acquisition." Treas. Regs. 118, § 39.22(a)–20 (1953) (emphasis added). The Senate Report recognized this regulation as the source of the new § 336, S. Rep. No. 1622, 83d Cong., 2d Sess., 258 (1954). The House Report explained its version of the provision: "Thus, the fact that the property distributed has *appreciated or depreciated* in value over its adjusted basis to the distributing corporation will in no way alter the application of subsection (a) [providing nonrecognition]." H. R. Rep. No. 1337, 83d Cong., 2d Sess., A90 (1954) (emphasis added). This background indicates that the real concern of the provision is to prevent recognition of market appreciation that has not been realized by an arm's-length transfer to an unrelated party rather than to shield all types of income that might arise from the disposition of an asset.

Despite the breadth of the nonrecognition language in § 336, the rule of nonrecognition clearly is not without exception. For instance, § 336 does not bar the recapture under § 1245 and § 1250 of excessive depreciation taken on distributed assets. §§ 1245(a), 1250(a); Treas. Reg. §§ 1.1245–6(b), 1.1250–1(c)(2), 26 CFR §§ 1.1245–6(b), 1.1250–1(c)(2) (1982). Even in the absence of countervailing statutory provisions, courts have never read the command of nonrecognition in § 336 as absolute. The "assignment of income" doctrine has always applied to distributions in liquidation. See, *e. g.*, *Siegel* v. *United States*, 464 F. 2d 891 (CA9 1972), cert. dism'd, 410 U. S. 918 (1973); *Williamson* v. *United States*, 155 Ct. Cl. 279, 292 F. 2d 524 (1961); see also *Idaho First National Bank* v. *United States*, 265 F. 2d 6 (CA9 1959) (decided before *General Utilities* codified in § 336). That judicial doctrine prevents taxpayers from avoiding taxation by shifting income from the person or entity that earns it to

someone who pays taxes at a lower rate.[34]  Since income recognized by the corporation is subject to the corporate tax and is again taxed at the individual level upon distribution to the shareholder, shifting of income from a corporation to a shareholder can be particularly attractive: it eliminates one level of taxation.  Responding to that incentive, corporations have attempted to distribute to shareholders fully performed contracts or accounts receivable and then to invoke § 336 to avoid taxation on the income.  In spite of the language of nonrecognition, the courts have applied the assignment-of-income doctrine and required the corporation to recognize the income.[35]  Section 336, then, clearly does not shield the taxpayer from recognition of *all* income on the distribution.

Next, we look to a companion provision—§ 337, which governs sales of assets followed by distribution of the proceeds in liquidation.[36]  It uses essentially the same broad language to

---

[34] For instance, a taxpayer cannot avoid recognizing the interest income on bonds that he owns by clipping the coupons and giving them to another party.  See, *e. g.*, *Helvering* v. *Horst*, 311 U. S. 112 (1940); *Lucas* v. *Earl*, 281 U. S. 111 (1930).

[35] Indeed, the legislative history of § 336 compels such a result.  Section 336 arose out of the same provision in the House bill as did § 311, which provides for nonrecognition of gain on nonliquidating distributions of appreciated property, and the Senate comment on § 311 explicitly provides for the application of the assignment-of-income doctrine.  S. Rep. No. 1622, 83d Cong., 2d Sess., 247 (1954).

[36] In relevant part, § 337 provides:

"(a) If within the 12-month period beginning on the date on which a corporation adopts a plan of complete liquidation, all of the assets of the corporation are distributed in complete liquidation, less assets retained to meet claims, then no gain or loss shall be recognized to such corporation from the sale or exchange by it of property within such 12-month period.

"(b) (1) For purposes of subsection (a), the term 'property' does not include—

"(A) stock in trade of the corporation, or other property of a kind which would properly be included in the inventory of the corporation if on hand at the close of the taxable year, and property held by the corporation primarily for sale to customers in the ordinary course of its trade or business,

shield the corporation from the recognition of gain on the sale of the assets. The similarity in language alone would make the construction of § 337 relevant in interpreting § 336. In addition, the function of the two provisions reveals that they should be construed in tandem. Section 337 was enacted in response to the distinction created by *United States* v. *Cumberland Public Service Co.*, 338 U. S. 451 (1950), and *Commissioner* v. *Court Holding Co.*, 324 U. S. 331 (1945). Under those cases, a corporation that liquidated by distributing appreciated assets to its shareholders recognized no income, as now provided in § 336, even though its shareholders might sell the assets shortly after the distribution. See *Cumberland.* If the corporation sold the assets, though, it would recognize income on the sale, and a sale by the shareholders after distribution in kind might be attributed to the corporation. See *Court Holding.* To eliminate the necessarily formalistic distinctions and the uncertainties created by *Court Holding* and *Cumberland,* Congress enacted § 337, permitting the corporation to adopt a plan of liquidation, sell

---

"(B) installment obligations acquired in respect of the sale or exchange (without regard to whether such sale or exchange occurred before, on, or after the date of the adoption of the plan referred to in subsection (a)) of stock in trade or other property described in subparagraph (A) of this paragraph, and

"(C) installment obligations acquired in respect of property (other than property described in subparagraph (A)) sold or exchanged before the date of the adoption of such plan of liquidation.

"(2) Notwithstanding paragraph (1) of this subsection, if substantially all of the property described in subparagraph (A) of such paragraph (1) which is attributable to a trade or business of the corporation is, in accordance with this section, sold or exchanged to one person in one transaction, then for purposes of subsection (a) the term 'property' includes—

"(A) such property so sold or exchanged, and

"(B) installment obligations acquired in respect of such sale or exchange.

"(c) (1) This section shall not apply to any sale or exchange—

"(A) made by a collapsible corporation (as defined in section 341(b)), or

"(B) following the adoption of a plan of complete liquidation, if section 333 applies with respect to such liquidation."

its assets without recognizing gain or loss at the corporate level, and distribute the proceeds to the shareholders. The very purpose of § 337 was to create the same consequences as § 336. See *Midland-Ross Corp.* v. *United States*, 485 F. 2d 110 (CA6 1973); S. Rep. No. 1622, *supra*, at 258.

There are some specific differences between the two provisions, largely aimed at governing the period during which the liquidating corporation sells its assets, a problem that does not arise when the corporation distributes its assets to its shareholders. For instance, § 337 does not shield the income produced by the sale of inventory in the ordinary course of business; that income will be taxed at the corporate level before distribution of the proceeds to the shareholders. See § 337(b). These differences indicate that Congress did not intend to allow corporations to escape taxation on business income earned while carrying on business in the corporate form; what it did intend to shield was market appreciation.

The question whether § 337 protects the corporation from recognizing income because of unwarranted deductions has arisen frequently, and the rule is now well established that the tax benefit rule overrides the nonrecognition provision. *Connery* v. *United States*, 460 F. 2d 1130 (CA3 1972); *Commissioner* v. *Anders*, 414 F. 2d 1283 (CA10), cert. denied, 396 U. S. 958 (1969); *Krajeck* v. *United States*, 75–1 USTC ¶ 9492 (ND 1975); *S. E. Evans, Inc.* v. *United States*, 317 F. Supp. 423 (Ark. 1970); *Anders* v. *United States*, 199 Ct. Cl. 1, 462 F. 2d 1147, cert. denied, 409 U. S. 1064 (1972); *Estate of Munter* v. *Commissioner*, 63 T. C. 663 (1975); Rev. Rul. 61–214, 1961–2 Cum. Bull. 60; Byrne, The Tax Benefit Rule as Applied to Corporate Liquidations: Recent Developments, 56 Notre Dame Law. 215, 221 (1980); Note, Tax Treatment of Previously Expensed Assets in Corporate Liquidations, 80 Mich. L. Rev. 1636, 1638–39 (1982); cf. *Spitalny* v. *United States*, 430 F. 2d 195 (CA9 1970) (when deduction and liquidation occur within a single year, though tax benefit rule does not apply, principle does). Congress has recently under-

taken major revisions of the Code, see Economic Recovery Tax Act of 1981, Pub. L. 97–34, 95 Stat. 172, and has made changes in the liquidation provisions, *e. g.*, Pub. L. 95–600, 92 Stat. 2904 (amending § 337); Pub. L. 95–628, 92 Stat. 3628 (same), but it did not act to change this longstanding, universally accepted rule. If the construction of the language in § 337 as permitting recognition in these circumstances has the acquiescence of Congress, *Lorillard* v. *Pons*, 434 U. S. 575, 580 (1978), we must conclude that Congress intended the same construction of the same language in the parallel provision in § 336.

Thus, the legislative history of § 336, the application of other general rules of tax law, and the construction of the identical language in § 337 all indicate that § 336 does not permit a liquidating corporation to avoid the tax benefit rule. Consequently, we reverse the judgment of the Court of Appeals and hold that, on liquidation, Bliss must include in income the amount of the unwarranted deduction.[37]

---

[37] Some commentators have argued that the correct measure of the income that Bliss should include is the lesser of the amount it deducted or the basis that the shareholders will take in the asset. See Feld, The Tax Benefit of *Bliss*, 62 B. U. L. Rev. 443, 463–464 (1982); see also Rev. Rul. 74–396, 1974–2 Cum. Bull. 106. Since Bliss has not suggested that, if there is an amount taken into income, it should be less than the amount previously deducted, we need not address the point.

As JUSTICE STEVENS observes, *post*, at 419, n. 29, we do not resolve this question. His perception of ambiguities elsewhere in our discussion of the amount recognized as income is simply inaccurate. Our discussion of the tax consequences on the sale of an expensed asset, *supra*, at 395, does not suggest that the entire amount of proceeds on sale is attributable to the tax benefit rule. Instead, we illustrated that the basis rules automatically lead to inclusion of the amount attributable to the operation of the tax benefit rule. That is, the proceeds will equal the cost plus any appreciation (or less any decrease in value). The appreciation would be recognized as gain (or the decrease as loss) in the ordinary sale, regardless of whether the taxpayer had expensed the asset upon acquisition. The reduction of the basis to zero when the item is expensed ensures that if it is sold rather than consumed the unwarranted deduction will be included in income along with any appreciation, and it is this amount that the tax benefit rule requires to be recognized as income.

## V

Bliss paid the assessment on an increase of $60,000 in its taxable income. In the District Court, the parties stipulated that the value of the grain was $56,565, but the record does not show what the original cost of the grain was or what portion of it remained at the time of liquidation. The proper increase in taxable income is the portion of the cost of the grain attributable to the amount on hand at the time of liquidation. In *Bliss*, then, we remand for a determination of that amount. In *Hillsboro*, the taxpayer sought a redetermination in the Tax Court rather than paying the tax, so no further proceedings are necessary, and the judgment of the Court of Appeals is reversed.

*It is so ordered.*

JUSTICE BRENNAN, concurring in No. 81–930 and dissenting in No. 81–485.

I join Parts I, II, and IV of the Court's opinion. For the reasons expressed in Part I of JUSTICE BLACKMUN's dissenting opinion, however, I believe that a proper application of the principles set out in Part II of the Court's opinion would require an affirmance rather than a reversal in No. 81–485.

JUSTICE STEVENS, with whom JUSTICE MARSHALL joins, concurring in the judgment in No. 81–485 and dissenting in No. 81–930.

These two cases should be decided in the same way. The taxpayer in each case is a corporation. In 1972 each taxpayer made a deductible expenditure, and in 1973 its shareholders received an economic benefit. Neither corporate taxpayer ever recovered any part of its 1972 expenditure. In my opinion, the benefits received by the shareholders in 1973 are matters that should affect their returns; those benefits should not give rise to income on the 1973 return of the taxpayer in either case.

Both cases require us to apply the tax benefit rule. This rule has always had a limited, but important office: it deter-

mines whether certain events that enrich the taxpayer—recoveries of past expenditures—should be characterized as income.[1]  It does not create income out of events that do not enhance the taxpayer's wealth.

Today the Court declares that the purpose of the tax benefit rule is "to approximate the results produced by a tax system based on transactional rather than annual accounting." *Ante*, at 381.  Whereas the rule has previously been used to determine the character of a current wealth-enhancing event, when viewed in the light of past deductions, the Court now suggests that the rule requires a study of the propriety of earlier deductions, when viewed in the light of later events. The Court states that the rule operates to "cancel out" an earlier deduction if the premise on which it is based is "fundamentally inconsistent" with an event in a later year.  *Ante*, at 383.[2]

The Court's reformulation of the tax benefit rule constitutes an extremely significant enlargement of the tax collector's powers.  In order to identify the groundbreaking character of the decision, I shall review the history of the tax benefit rule.  I shall then discuss the *Bliss Dairy* case in some detail, to demonstrate that it fits comfortably within

---

[1] Cf. H. Simons, Personal Income Taxation 50 (1938) (defining income as net accumulation of property rights over the course of a year, plus consumption during that year).

[2] Notwithstanding this focus on the legitimacy of the 1972 deductions, scrutinized with the aid of hindsight after the completion of a multiyear transaction, the Court is careful not to require that "transactional inequities" be dealt with in the most "precise way" imaginable.  *Ante*, at 378, n. 10.  It rejects JUSTICE BLACKMUN's suggestion that the 1972 tax returns be reopened, quite properly noting our past observations that " '[i]t would be disruptive of an orderly collection of the revenue to rule that the accounting must be done over again to reflect events occurring after the year for which the accounting is made, and would violate the spirit of the annual accounting system.' "  *Ante*, at 380, n. 10, quoting *Healy v. Commissioner*, 345 U. S. 278, 285 (1953).  See also *ante*, at 380–381, n. 12.

the class of cases to which the tax benefit rule has not been applied in the past. Finally, I shall explain why the Court's adventure in lawmaking is not only misguided but does not even explain its inconsistent disposition of these two similar cases.

## I

What is today called the "tax benefit rule" evolved in two stages, reflecting the rule's two components. The "inclusionary" component requires that the recovery within a taxable year of an item previously deducted be included in gross income. The "exclusionary component," which gives the rule its name, allows the inclusionary component to operate only to the extent that the prior deduction benefited the taxpayer.

The inclusionary component of the rule originated in the Bureau of Internal Revenue in the context of recoveries of debts that had previously been deducted as uncollectible. The Bureau sensed that it was inequitable to permit a taxpayer to characterize the recovery of such a debt as "return of capital" when in a prior year he had been allowed to reduce his taxable income to compensate for the loss of that capital. As one commentator described it, "the allowance of a deduction results in a portion of gross income not being taxed; when the deducted item is recouped, the recovery stands in the place of the gross income which had not been taxed before and is therefore taxable."[3] This principle was quickly endorsed by the Board of Tax Appeals and the courts. See *Excelsior Printing Co.* v. *Commissioner*, 16 B. T. A. 886 (1929); *Putnam National Bank* v. *Commissioner*, 50 F. 2d 158 (CA5 1931).

---

[3] Plumb, The Tax Benefit Rule Today, 57 Harv. L. Rev. 129, 131, n. 10 (1943). Accord, *Estate of Collins* v. *Commissioner*, 46 B. T. A. 765, 769 (1942), rev'd *sub nom. Harwick* v. *Commissioner*, 133 F. 2d 732 (CA8), rev'd *sub nom. Dobson* v. *Commissioner*, 320 U. S. 489 (1943).

The exclusionary component was not so readily accepted. The Bureau first incorporated it during the Great Depression as the natural equitable counterweight to the inclusionary component. G. C. M. 18525, 1937–1 Cum. Bull. 80. It soon retreated, however, insisting that a recovery could be treated as income even if the prior deduction had not benefited the taxpayer. G. C. M. 22163, 1940–2 Cum. Bull. 76. The Board of Tax Appeals protested, *e. g., Corn Exchange National Bank & Trust Co.* v. *Commissioner*, 46 B. T. A. 1107 (1942), but the Circuit Courts of Appeals sided with the Bureau. *Helvering* v. *State-Planters Bank & Trust Co.*, 130 F. 2d 44 (CA4 1942); *Commissioner* v. *United States & International Securities Corp.*, 130 F. 2d 894 (CA3 1942). At that point, Congress intervened for the first and only time. It enacted the forerunner of § 111 of the present Code, ch. 619, Title I, § 116(a), Act of Oct. 21, 1942, 56 Stat. 812, using language that by implication acknowledges the propriety of the inclusionary component by explicitly mandating the exclusionary component.[4]

The most striking feature of the rule's history is that from its early formative years, through codification, until the 1960's, Congress,[5] the Internal Revenue Service,[6] courts,[7]

---

[4] Section 111(a) provides:

"Gross income does not include income attributable to the *recovery* during the taxable year of a bad debt, prior tax, or delinquency amount, to the extent of the amount of the recovery exclusion with respect to such debt, tax, or amount" (emphasis added).

[5] *Ibid.* See also the detailed provisions of ch. 619, Title I, § 156(a) of the Act of Oct. 21, 1942, 56 Stat. 852, amended, Act of Aug. 16, 1954, ch. 736, 68A Stat. 343, repealed, Pub. L. 94–455, Title XIX, § 1901(a)(145)(A), Act of Oct. 4, 1976, 90 Stat. 1788, establishing a mechanism for including the recoveries of previously claimed war losses in current income to the extent of tax benefit.

[6] Consider the following passages from the regulations under § 111.

"*General.* Section 111 provides that income attributable to the *recovery during any taxable year* of bad debts, prior taxes, and delinquency amounts shall be excluded from gross income to the extent of the 'recov-

and commentators,[8] understood it in essentially the same way. They all saw it as a theory that appropriately characterized certain recoveries of capital as income. Although the rule undeniably helped to accommodate the annual accounting system to multiyear transactions, I have found no sugges-

---

ery exclusion' with respect to such items. The rule of exclusion so prescribed by statute applies equally with respect to all other losses, expenditures and accruals made the basis of deductions from gross income for prior taxable years, including war losses . . . , but not including deductions with respect to depreciation, depletion, amortization, or amortizable bond premiums. . . .

.      .        .        .        .

"*Definition of 'recovery'*. Recoveries result from the *receipt of amounts* in respect of the previously deducted or credited section 111 items, such as from the collection or sale of a bad debt, refund or credit of taxes paid, or cancellation of taxes accrued." Treas. Reg. § 1.111–1(a), 26 CFR § 1.111–1(a) (1982) (emphasis added).

Consider also:

"If the taxpayer deducted a loss in accordance with the provisions of this paragraph and in a subsequent taxable year receives reimbursement for such loss, he does not recompute the tax for the taxable year in which the deduction was taken but includes the amount of such reimbursement in his gross income for the taxable year in which received, subject to the provisions of section 111, relating to recovery of amounts previously deducted." Treas. Reg. § 1.165–1(d)(2)(iii), 26 CFR § 1.165–1(d)(2)(iii) (1982).

[7] *E. g.*, *National Bank of Commerce* v. *Commissioner*, 115 F. 2d 875 (CA9 1940); *South Dakota Concrete Products Co.* v. *Commissioner*, 26 B. T. A. 1429 (1932).

[8] See Costigan, Income Taxes on Recoveries from Civil Litigation, Proceedings of the U. S. C. Tax Inst. 559, 567–570 (1954); Atlas, Tax Free Recoveries: The Tax Benefit Rule, N. Y. U. 9th Inst. on Fed. Tax. 847 (1951); Tye, The Tax Benefit Doctrine Reexamined, 3 Tax L. Rev. 329 (1948); Plumb, The Tax Benefit Rule Today, 57 Harv. L. Rev. 129, 131, n. 10, 176 (1943); Lassen, The Tax Benefit Rule and Related Problems, 20 Taxes 473, 475 (1942) (statute of limitations not a problem because "all these cases have a new element, namely, a recovery or increment in value or decrease of liability in the year in which income was determined by the Commissioner to have been received); Note, 56 Harv. L. Rev. 434, 436 (1942); Zysman, Income Derived From the Recovery of Deductions, 19 Taxes 29 (1941); Ayers, Bad Debts—Deductions and Recoveries, 18 Taxes 549 (1940).

tion that it was regarded as a generalized method of approximating a transactional accounting system through the fabrication of income at the drop of a fundamentally inconsistent event.[9] An inconsistent event was always a necessary condition, but with the possible exception of the discussion of the Board of Tax Appeals in *Barnett* v. *Commissioner*, 39 B. T. A. 864, 867 (1939), inconsistency was never by itself a sufficient reason for applying the rule.[10] Significantly, the first case from this Court dealing with the tax benefit rule emphasized the role of a recovery.[11] And when litigants in

---

[9] Except for *Barnett* v. *Commissioner*, 39 B. T. A. 864 (1939), all of the early cases cited by the Court, *ante*, at 386–387, involved a recovery. In *Estate of Block* v. *Commissioner*, 39 B. T. A. 338, 341 (1939), the Board of Tax Appeals made the following statement:

"When recovery or some other event which is inconsistent with what has been done in the past occurs, adjustment must be made in reporting income for the year in which the change occurs. No other system would be practical in view of the statute of limitations, the obvious administrative difficulties involved, and the lack of finality in income tax liability, which would result. The foregoing principles, which have been established by the following cases, require that the refund here be included in the income of this estate for the year of recovery."

Notwithstanding the general reference to an inconsistent event in the first quoted sentence, it is obvious from the two succeeding sentences that the Board was not intending to lay the groundwork for a new theory of the tax benefit rule. Rather, it was attempting to respond to the suggestion that the adjustment be made in the year of deduction rather than the year of recovery. This conclusion is confirmed by the fact that the third quoted sentence speaks of "the year of recovery," not "the year of inconsistent event," and by the fact that each of the 14 cases cited by the Board following the conclusion of the quoted passage, like *Estate of Block* itself and like *South Dakota Concrete Products Co.* v. *Commissioner, supra,* involved recoveries in the traditional sense.

[10] It should be noted that even in *Barnett*, the Board of Tax Appeals included its discussion of inconsistent events only after emphasizing that the inclusion in income of a prior oil depletion deduction was required by Treasury Regulations that had been ratified by Congress. 39 B. T. A., at 867.

[11] In *Dobson* v. *Commissioner*, 320 U. S. 489 (1943), the taxpayer had bought stock, sold it at a loss, and then claimed a deductible loss on his tax return. Eight years later, the taxpayer had sued for rescission of the stock purchase, claiming fraud; he settled the suit and received approxi-

this Court suggested that a transactional accounting system would be more equitable, we expressly declined to impose one, stressing the importance of finality and practicability in a tax system.[12]

mately $30,000 for the stock on which he had sustained the loss.  We upheld the Tax Court's determination that the $30,000 recovery did not need to be reported as income, since the earlier deductible losses had not reduced the taxpayer's taxes in the year he had claimed them.  For present purposes, the holding in *Dobson* was less significant than the way it endorsed the Tax Court's analysis:

"'The Tax Court has not attempted to revise liability for earlier years closed by the statute of limitation, nor used any expense, liability, or deficit of a prior year to reduce the income of a subsequent year.  *It went to prior years only to determine the nature of the recovery, whether return of capital or income.*'  *Id.*, at 493 (emphasis added).

The tax benefit question was not one of inconsistent events, but whether a recovery should be characterized as return of capital or as income.

[12] *Burnet* v. *Sanford & Brooks Co.*, 282 U. S. 359 (1931), was a mirror image of this case.  The taxpayer argued that a recovery of previously deducted funds should not be income because, seen from a transactional view, no net profits had been realized.  The Court framed the issue as whether net profits are to be determined "on the basis of fixed accounting periods, or . . . on the basis of particular transactions of the taxpayer when they are brought to a conclusion."  *Id.*, at 363.  The answer was unanimous and unflinching:

"A taxpayer may be in receipt of net income in one year and not in another. The net result of the two years, if combined in a single taxable period, might still be a loss; but it has never been supposed that that fact would relieve him from a tax on the first, or that it affords any reason for postponing the assessment of the tax until the end of a lifetime, or for some other indefinite period, to ascertain more precisely whether the final outcome of the period, or of a given transaction, will be a gain or a loss.

"The Sixteenth Amendment was adopted to enable the government to raise revenue by taxation.  It is the essence of any system of taxation that it should produce revenue ascertainable, and payable to the government, at regular intervals.  Only by such a system is it practicable to produce a regular flow of income and apply methods of accounting, assessment, and collection capable of practical operation.  It is not suggested that there has ever been any general scheme for taxing income on any other basis. . . . While, conceivably, a different system might be devised by which the tax could be assessed, wholly or in part, on the basis of the finally ascertained results of particular transactions, Congress is not required by the amend-

In the 1960's, the Commissioner, with the support of some commentators and the Tax Court, began to urge that the tax benefit rule be given a more ambitious office.[13] In *Nash* v. *United States*, 398 U. S. 1 (1970), the Commissioner argued that the rule should not be limited to cases in which the taxpayer had made an economic recovery, but rather should operate to cancel out an earlier deduction whenever later events demonstrate that the taxpayer is no longer entitled to it. The arguments advanced, and rejected, in that case were remarkably similar to those found in the Court's opinion today.[14]

---

ment to adopt such a system in preference to the more familiar method, even if it were practicable." *Id.*, at 364–365.

*Healy* v. *Commissioner*, 345 U. S. 278 (1953), dealt with a more extreme effort to approximate a transactional accounting system—more closely analogous to JUSTICE BLACKMUN's approach than to the Court's today. In that case, a taxpayer received money under a claim of right in an early year and was forced to disgorge it in a later year. The Government was perfectly willing to allow the taxpayer to take a deduction in the year of disgorgement (presumably under a "tax detriment" theory, since repayments of loans are usually not deductible), but the taxpayer wanted to be able to go back and reopen the prior year, in which he had included the receipt in income. The Court refused to allow the reopening, extolling the virtues of an annual accounting system. *Id.*, at 284–285. See n. 2, *supra*.

[13] See Rev. Rul. 62–128, 1962–2 Cum. Bull. 139; Note, 21 Vand. L. Rev. 995 (1968); *Estate of Schmidt* v. *Commissioner*, 42 T. C. 1130 (1964), rev'd, 355 F. 2d 111 (CA9 1966).

[14] For example:

"The [tax benefit] rule rests on the notion that a taxpayer should not be permitted to retain the tax benefit of a deduction when later events demonstrate that he no longer is entitled to it. . . . To limit application of the rule to cases in which there has been an economic recovery would frustrate its purpose, which is to insure that a taxpayer not retain the benefit of a deduction to which he is no longer entitled. Fulfillment of that purpose requires application of the rule, whether the lack of need for a bad debt reserve arises from a sale or collection of accounts receivable, or merely by reason of the termination of the existence of the owner of the receivables. . . . The proper analysis of the transaction where accounts receivable are sold for their net value by a reserve method taxpayer is to restore

The *Nash* case arose out of the sale of a partnership business to a corporation. The partnership had taken deductions for ledger entries in a "bad debt reserve"—an account that reflected the firm's estimate of its future losses from accounts receivable that would *eventually* become uncollectible. When the partnership business was sold to a corporation, the Commissioner sought to apply the tax benefit rule, arguing that even though the partnership had made no recovery of the amount in the bad debt reserve, the deductibility of the presale additions to the taxpayer's reserve had been justified on the basis of an assumption that was no longer valid after the business was sold.[15]

This Court flatly rejected the Commissioner's position. Rather than scrutinizing the premises of the prior deduction in the light of subsequent events, the Court used the subsequent events themselves as its starting point. Since the transfer of the bad debt reserve did not enrich the taxpayer, there was no current realization event justifying the application of the tax benefit rule. "[A]lthough the 'need' for the reserve ended with the transfer, the end of that need did

the reserve to his income and accord him a loss on the sale of property. That this loss (face value less amount realized) equals the amount of the restoration to income does not militate against the basic principle that the reserve must be restored to income when it is no longer needed, irrespective of whether there has been an economic recovery." Brief for United States in *Nash* v. *United States*, O. T. 1969, No. 678, pp. 8–14.

[15] The Commissioner argued that (a) an accrual basis taxpayer is normally only allowed to deduct accounts receivable that are uncollectible, (b) the taxpayer had been allowed to take a deduction because the taxpayer was being allowed to represent that it would eventually find some presently collectible accounts to be uncollectible, and (c) those accounts had *not* in fact become uncollectible at the time they left the taxpayer's hands. The Commissioner asserted that the earlier deduction had been allowed on the assumption that it fairly represented the taxpayer's continuing "need" for bad debt deductions across taxable years. He argued that once the accounts receivable left the taxpayer's hands, it had no further "need" for the bad debt reserve and that the premise for the prior deduction had become invalid. See *ibid.*

not mark a 'recovery' within the meaning of the tax benefit cases." *Id.*, at 5.[16]

Today, the Court again has before it a case in which the Commissioner, with the endorsement of some commentators and a closely divided Tax Court, is pushing for a more ambitious tax benefit rule.[17] This time, the Court accepts the invitation. Since there has been no legislation since *Nash* suggesting that our approach over the past half-century[18] has been wrong-headed, cf. n. 32, *infra*, the new doctrine that emerges from today's decision is of the Court's own making.

## II

In the *Bliss Dairy* case, the Court today reaches a result contrary to that dictated by a recovery theory. One would not expect such a break with the past unless it were apparent that prior law would produce a palpable inequity—a clear windfall for the taxpayer. Yet that is not the case in *Bliss Dairy*. Indeed, the tax economics of the case are indistinguishable from those of the *Nash* case.

---

[16] The taxpayer's receipts from the sale of the business was not a recovery because, to the extent the accounts receivable were offset by the bad debt reserve, the corporation had not paid the taxpayer a penny for them. It was this fact that distinguished *Nash* and *Schmidt* from earlier cases applying the tax benefit rule to bad debt reserves such as *Arcadia Savings & Loan Assn.* v. *Commissioner*, 300 F. 2d 247 (CA9 1962), *Citizens Federal Savings & Loan Assn.* v. *United States*, 154 Ct. Cl. 305, 290 F. 2d 932 (1961), *West Seattle National Bank* v. *Commissioner*, 288 F. 2d 47 (CA9 1961), and *S. Rossin & Sons, Inc.* v. *Commissioner*, 113 F. 2d 652 (CA2 1940).

[17] See Rev. Rul. 74-396, 1974-2 Cum. Bull. 106; Feld, The Tax Benefit of *Bliss*, 62 B. U. L. Rev. 443 (1982); *Tennessee-Carolina Transportation, Inc.* v. *Commissioner*, 65 T. C. 440 (1975), aff'd, 582 F. 2d 378 (CA6 1978), cert. denied, 440 U. S. 909 (1979). Contra, O'Hare, Application of Tax Benefit Rule in New Case Threatens Certain Liquidations, 44 J. Taxation 200 (1976); Broenen, The Tax Benefit Rule and Sections 332, 334(b)(2) and 336, 53 Taxes 231 (1975).

[18] *Nash* and *Dobson* are the only tax benefit rule cases ever decided in this Court. On one other occasion, the Court invoked the tax benefit rule by analogy. *United States* v. *Skelly Oil Co.*, 394 U. S. 678, 688, and n. 5 (1969).

Three statutory provisions, as interpreted by the Commissioner, interact in *Bliss Dairy*. First, pursuant to § 162(a),[19] the Commissioner allowed the corporation to deduct the entire cost of all grain purchased in 1972. That deduction left it with a basis of zero in that grain. Second, under the terms of § 336,[20] the corporation was not required to recognize any gain or loss when it went through a § 333 liquidation in 1973. And third, pursuant to the regulations implementing § 334,[21] the shareholders were allowed to assign some portion of their basis in the corporation's stock to the grain they received in the liquidation. Admittedly, this combination of provisions could in some cases cause a "step-up" in the grain's basis that is not reflected in the income of either the corporation or the shareholders. That possibility figured strongly in the decision of the Court of Appeals for the Sixth Circuit to endorse an inconsistent-event theory in a precursor of this case. See *Tennessee-Carolina Transportation, Inc.* v. *Commissioner*, 582 F. 2d 378, 382, and n. 14 (1978). And it is stressed by the Solicitor General in his argument in this case. Brief for United States in No. 81–930 and for Respondent in No. 81–485, pp. 39–42. Yet close analysis reveals that the potential untaxed step-up is not the sort of extraordinary and inequitable windfall that calls for extraordinary measures in *this* case.

---

[19] In relevant part, 26 U. S. C. § 162(a) provides that "[t]here shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business . . . ."

[20] In relevant part, 26 U. S. C. § 336 provides that "no gain or loss shall be recognized to a corporation on the distribution of property in partial or complete liquidation."

[21] In relevant part, 26 U. S. C. § 334 provides that "[i]f . . . property was acquired by a shareholder in the liquidation of a corporation in cancellation or redemption of stock, and . . . the extent to which gain was recognized was determined under § 333, then the basis shall be the same as the basis of such stock cancelled or redeemed in the liquidation, decreased in the amount of any money received by the shareholder, and increased in the amount of gain recognized to him." The relevant implementing regulations are found at Treas. Reg. § 1.334–2, 26 CFR § 1.334–2 (1982).

As a factual matter, the record does not include the tax returns of Bliss Dairy's shareholders. We have no indication of how much, if any, step-up in basis actually occurred. And as a legal matter, a § 333 liquidation expressly contemplates steps-up in basis that are not reflected in income. Thus, even if the corporation had behaved as the Court believes it should have and had fed all the grain to the cows before liquidating, whatever shareholder stock basis was assigned to the grain in this case would have been used to step up the basis of some other asset that passed to the shareholders in the liquidation.

I suppose it might be argued that this sort of untaxed step-up is acceptable if it happens accidentally, but not if a taxpayer manipulates business transactions solely to take advantage of it. Yet here again we have too little information to conclude that there has been any such manipulation in the case of Bliss Dairy. To begin with, the Government has never questioned the propriety of the 1972 deduction, viewed in the light of 1972 events.[22] Moreover, the record before us on appeal does not tell us how much feed the Dairy's cattle consumed in 1972, whether 1972 consumption exceeded 1972 purchases, or how the volume purchased in 1972 compared with purchases in prior years. Indeed, it is quite possible that in 1971 the Dairy had made abnormally large purchases as a hedge against a possible rise in the market price, and that its 1972 consumption of grain actually exceeded its $150,000 in purchases during that year.

It is no doubt for these reasons that the Court never relies on the untaxed step-up argument in its opinion today.[23] Un-

---

[22] The Court's partial quotation of Treas. Reg. § 1.162–3, 26 CFR 1.162–3 (1982), *ante,* at 395, suggests that it may regard the deduction for unconsumed feed as improper because the feed was not "actually *consumed and used in operation* in the taxable year," *ibid.* Of course, if the Court really believed that such a deduction should not be allowed, the proper course of action would be to modify the rules authorizing the deduction, see n. 31, *infra,* rather than to modify the tax benefit rule.

[23] It should also be noted that the potential for an untaxed step-up, which may give rise to a second deduction in cases such as this, is analytically the

fortunately, the only argument the Court offers in its place is an *ipse dixit:* it seems wrong for a taxpayer not to realize income if it fails to use up an asset, when it was allowed to deduct the value of that asset in a prior year. We rejected that precise proposition in *Nash.* In both *Nash* and *Bliss Dairy,* the transfer of the business in a subsequent year revealed that a business asset matching a prior deduction (*i. e.*, grain matching the expense deduction, or the account receivable matching the bad debt deduction) would not be used up (*i. e.,* consumed or become uncollectible) until it had passed to a different taxpayer.[24] The only explanation for today's decision to detach the tax benefit rule from the recovery mooring appears to be the challenge to be found in an open sea of troublesome and inconclusive hypothetical cases.[25]

same as the potential for a double deduction that was present in *Nash.* See Brief for United States in *Nash* v. *United States,* O. T. 1969, No. 678, pp. 20–31.

[24] The Solicitor General made this timing point explicit in *Nash.* "Since a reserve for bad debts represents losses that are estimated will be sustained in subsequent taxable years, . . . any unabsorbed amounts in such a reserve must be restored to income when . . . it becomes clear that the taxpayer will not suffer some or all of the estimated losses as a result of the uncollectibility of accounts receivable." *Id.,* at 8–9.

[25] The flaws in the Court's approach are exemplified by its discussion, *ante,* at 384–385, of a hypothetical situation involving a tenant who has paid the entire cost of a 30-day lease that straddles two taxable years on December 15 of the first year.

The Court first invites consideration of what tax consequences would result if the premises burn down in January of the second year. I would think it obvious that a taxpayer does not realize income under such circumstances, and the Court manages to accommodate this result to its theory. Even though the original explanation for the deduction (the business would make use of the premises) is no longer valid, the Court finds no fundamental inconsistency because "the loss is attributable to the business."

The Court goes through this exercise in order to reach the next hypothetical, wherein the taxpayer *voluntarily* stops using the leasehold for a business purpose during the second year. Having assumed that the entire cost of the lease was deductible during the first year, the Court now de-

## III

Because tax considerations play such an important role in decisions relating to the investment of capital, the transfer of operating businesses, and the management of going concerns, there is a special interest in the orderly, certain, and consistent interpretation of the Internal Revenue Code. Today's decision seriously compromises that interest. It will engender uncertainty, it will enlarge the tax gatherer's discretionary power to reexamine past transactions, and it will produce controversy and litigation.

Any inconsistent-event theory of the tax benefit rule would make the tax system more complicated than it has been under the recovery theory.[26] Inconsistent-event analysis

---

clares that the tax benefit rule must be invoked to prevent a tax inequity. The Court's methodology in this regard is quite revealing. It has presumed the validity of the deduction in the first year, citing *Zaninovich* v. *Commissioner*, 616 F. 2d 429 (CA9 1980). Yet *Zaninovich* is still being debated in the lower courts, in part because of hypothetical cases such as this one, and has not been endorsed by either the Commissioner or the Tax Court. See *Keller* v. *Commissioner*, 79 T. C. 7, 40, n. 24 (1982); *Dunn* v. *United States*, 468 F. Supp. 991, 994, and n. 17 (SDNY 1979) (Weinfeld, J.). See also *Van Raden* v. *Commissioner*, 71 T. C. 1083, 1107 (1979) (suggesting a distinction between "period" costs and "product" costs), aff'd, 650 F. 2d 1046 (CA9 1981). Thus, the Court creates its own problem by blithely allowing a deduction in the initial period, with the intention of continuously second-guessing that decision in subsequent years. I do not see the advantage of this approach over JUSTICE BLACKMUN's suggestion, which is criticized by the Court *ante*, at 378–380, n. 10. Instead, I would prefer to think carefully about whether or not the deduction should be allowed in the first place (taking into account such factors as the ease with which a lease can be prorated, the likelihood of nonbusiness uses, and the bright-line recovery rule) and, if that results in a decision to grant the deduction, to abide by whatever consequences follow from the application of traditionally accepted tax principles.

[26] The Court suggests, *ante*, at 381–383, that a recovery requirement is both too narrow and too broad to give certain guidance. The Court suggests it is too narrow because the Court believes that the cancellations of indebtedness found in *Mayfair Minerals, Inc.* v. *Commissioner*, 456 F. 2d 622 (CA5 1972), *Bear Manufacturing Co.* v. *United States*, 430 F. 2d

forces a deviation from the traditional pattern of calculating income during a given year: identify the transactions in which the taxpayer was made wealthier, determine from the history of those transactions which apparent sources of enrichment should be characterized as income, and then determine how much of that income must be recognized. Of course, in several specific contexts, Congress has already mandated deviations from that traditional pattern,[27] and the additional complications are often deemed an appropriate price for enhanced tax equity. But to my knowledge Congress has never even considered so sweeping a deviation as a general inconsistent-event theory.

Nonetheless, a general inconsistent-event theory would surely give more guidance than the vague hybrid established by the Court today. The dimensions of the Court's newly fashioned "fundamentally inconsistent event" version of the

152 (CA7 1970), *Haynsworth* v. *Commissioner*, 68 T. C. 703 (1977), and *G. M. Standifer Construction Corp.* v. *Commissioner*, 30 B. T. A. 184 (1934), "[do] not fit within any ordinary definition of 'recovery.'" *Ante*, at 382. I disagree. As the Court concedes, *ibid.*, cancellation of a legally enforceable liability quite obviously increases the taxpayer's net worth. The Code therefore explicitly requires a discharge of indebtedness to be included in income. § 61(a)(12). Cf. § 108. It does no damage to the English language to say that a taxpayer who has previously incurred an expense by assuming a liability recovers that expense when the liability is canceled.

The Court suggests that the term "recovery" is too broad because two courts have claimed to find a recovery in situations the Court finds surprising. *Tennessee-Carolina Transportation, Inc.* v. *Commissioner*, 582 F. 2d 378 (CA6 1978) (alternative holding); *First Trust and Savings Bank of Taylorville* v. *United States*, 614 F. 2d 1142 (CA7 1980). Since I believe both cases were wrongly decided (*Tennessee-Carolina* applied the tax benefit rule to a case closely analogous to *Bliss Dairy*, and *First Trust* applied the rule to a case closely analogous to *Hillsboro Bank*), I do not find the Court's criticism any more persuasive than I would find a suggestion that someone might incorrectly think there was a "recovery" in the cases before us today.

[27] *E. g.*, §§ 1245, 1250 (mere dispositions of certain depreciable property and certain depreciable realty may give rise to income).

tax benefit rule are by no means clear.  It obviously differs from both the Government's "inconsistent event" theory and the familiar "recovery" theory, either of which would require these two cases to be decided in the same way.  I do not understand, however, precisely why the Court's theory distinguishes between these cases, or how it is to be applied in computing the 1973 taxes of Bliss Dairy, Inc.

The Government describes its test as whether "subsequent events eliminate the factual premise on which the deduction was originally claimed."  Brief for United States in No. 81–930 and for Respondent in No. 81–485, p. 18.  The Court describes its test as whether "the later event is indeed fundamentally inconsistent with the premise on which the deduction was initially based."  *Ante*, at 383.  One might infer that the difference between these tests is a difference between "inconsistent events" and "fundamentally inconsistent events." The Court attempts to place the line more precisely "between merely unexpected events and inconsistent events."  *Ante*, at 383, n. 15.  I am afraid the attempt fails because, however it is described, the line does not cleanly and predictably separate the Court's position from the Government's.

The Court presents its test as whether "the occurrence of the [later year's] event in the earlier year would have resulted in the disallowance of the deduction."  *Ante*, at 389. But in *Hillsboro*, the Court rejects the Government's claim. The Court holds that if this Court had decided *Lehnhausen* v. *Lakeshore Auto Parts Co.*, 410 U. S. 356 (1973), in 1972, the Bank would still have been entitled to deduct a dividend that was not used for the payment of taxes.  It attempts to read the legislative history of § 164(e) as establishing that Congress did not care about the use to which the dividend payment was put, but only about the Bank's reason for the dividend.  I would simply note that I find JUSTICE BLACKMUN's interpretation of § 164(e) far more plausible.

The Court's analysis of *Bliss Dairy* is equally unsatisfying. Without any mention of a same-year principle, the Court re-

solves the case in a single sentence: a § 336 liquidation is assimilated to a dividend distribution, which is deemed "the analog of personal consumption," and therefore "it would seem that it should take into income the amount of the earlier deduction." *Ante*, at 396, and n. 31.[28]  It is not obvious to me why the change in ownership of a going concern is more "the analog of personal consumption" than the gift of an asset.

The new rule will create even more confusion than that which will accompany efforts to reconcile the Court's disposition of these two cases.  Given that *Nash* is still considered good law by the Court, it is not clear which prior expenses of Bliss Dairy, Inc., will give rise to income in 1973.  Presumably, all expenses for the purchase of tangible supplies will be treated like the cattle feed.  Thus, all corporate paper towels, paper clips, and pencils that remain on hand will become income as a result of the liquidation.  It is not clear, however, how the Court would react to other expenses that provide an enduring benefit.  I find no limiting principle in the Court's opinion that distinguishes cattle feed and pencils from prepaid rent, prepaid insurance, accruals of employee vacation time, advertising, management training, or any other expense that will have made the going concern more valuable when it is owned directly by its shareholders.

The Court's opinion also leaves unclear the amount of income that is realized in the year in which the fundamentally inconsistent event occurs.  In most of its opinion, the Court indicates that the taxpayer is deemed to realize "the amount of his earlier deduction," *ante*, at 383, but from time to time the Court equivocates,[29] and at least once suggests that when

---

[28] It is noteworthy that the Court cites no authority for the assumption—critical under its interpretation of the tax benefit rule—that if the liquidation of Bliss Dairy, Inc., had occurred in 1972, the deduction for purchased but unconsumed cattle feed would have been disallowed.

[29] In a footnote, *ante*, at 402, n. 37, the Court suggests that it is not addressing the issue of whether some figure less than the amount previously deducted might be appropriate.  Two possibilities have been sug-

an expensed asset is sold, only the "amount of the proceeds on sale," *ante*, at 395, is income.[30]  Even in *Bliss Dairy*, which involves a revolving inventory of a fungible commodity, I am not sure how the Court requires the "cost" of the grain, *ante*, at 403, to be computed.  If the corporation's 1972 consumption matched its 1972 purchases, one might think that the relevant cost was that in the prior years when the surplus was built up.  I cannot tell whether or why the fundamentally inconsistent-event theory prefers LIFO accounting over FIFO.

## IV

Neither history nor sound tax policy supports the Court's abandonment of its interpretation of the tax benefit rule as a tool for characterizing certain recoveries as income.  If Congress were dissatisfied with the tax treatment that I believe *Bliss Dairy* should be accorded under current law, it could respond by changing any of the three provisions that bear on this case.  See *supra*, at 413.  It could modify the manner in which deductions are authorized under § 162.[31]  It could

---

gested: lesser-of-prior-deduction-and-current-fair-market-value, see *Tennessee Carolina Transportation, Inc.* v. *Commissioner*, 65 T. C. 440, 448 (1975), and lesser-of-prior-deduction-and-shareholder's-basis, see Feld, The Tax Benefit of *Bliss*, 62 B. U. L. Rev. 443 (1982).  Given the uniform tenor of the Court's theory that the tax benefit rule serves to " 'cancel out' an earlier deduction," *ante*, at 383, I think it unlikely that it would endorse either possibility.

[30] This view, of course, conforms to what a recovery theory would dictate.  See *Rosen* v. *Commissioner*, 611 F. 2d 942 (CA1 1980) (taxpayer realizes the value of recovered asset, determined at time of recovery).

[31] If it were so inclined, it could modify § 162(a) to provide that no deduction would be allowed for the purchase of materials and supplies; instead, a deduction would be allowed only at the time of consumption.  Such a sentiment clearly underlies the Court's statement, *ante*, at 395, that "[t]he deduction is predicated on the consumption of the asset in the trade or business."

Alternatively, it could provide that a purchase of materials and supplies not be considered an "ordinary and necessary expense" to the extent it includes items that will probably not be consumed during the taxable year.  As the Solicitor General notes in his brief before this Court, "income might

legislate another statutory exception to the annual accounting system, much as it did when it made the depreciation recapture provisions, §§ 1245, 1250, apply to § 336 liquidations.[32] Or it could modify the manner in which basis is allocated under § 334.[33] But in the absence of legislative action, I cannot join in the Court's attempt to achieve similar results by distorting the tax benefit rule.[34]

be more accurately reflected through the use of inventory accounting for such supplies," Brief for United States in No. 81–930 and for Respondent in No. 81–485, pp. 37–38. It bears mention that the Commissioner presently takes the position that an expenditure for feed that will be consumed in a subsequent year will not be allowed unless three tests are satisfied: it must be a payment (not a refundable deposit), it must be made for a business purpose and not merely for tax avoidance, and the deduction must not result in a material distortion of income. Rev. Rul. 79–229, 1979–2 Cum. Bull. 210. Cf. Treas. Reg. 1.162–12, 26 CFR § 1.162–12 (1982). The courts have divided over whether the Commissioner's position is consistent with the present § 162(a). Compare *Clement* v. *United States*, 217 Ct. Cl. 495, 580 F. 2d 422 (1978), cert. denied, 440 U. S. 907 (1979); *Dunn* v. *United States*, 468 F. Supp. 991 (SDNY 1979) (Weinfeld, J.) (supporting the Commissioner), with *Frysinger* v. *Commissioner*, 645 F. 2d 523 (CA5 1981); *Commissioner* v. *Van Raden*, 650 F. 2d 1046 (CA9 1981) (supporting the taxpayer).

[32] In 1975, Congress had before it, but was unable to pass, such legislation. H. R. 10936, 94th Cong., 1st Sess. (1975).

[33] In particular, it could prohibit the allocation of any shareholder basis to an expensed asset, thereby completely eliminating the possibility of the step-up discussed *supra*, at 413. Indeed, the Internal Revenue Service could do so consistently with the present text of § 334 by modifying Treas. Reg. § 1.334–2, 26 CFR § 1.334–2 (1982).

[34] Because I disagree with the Court's conclusion that Bliss Dairy, Inc., realized income upon liquidation, I obviously do not reach the issue of how § 336, the nonrecognition provision, should be construed. I would observe, however, that in order to justify its conclusion, the Court is forced to override the plain language of § 336. See *ante*, at 397–402; n. 20, *supra*. The Court justifies this course of action by invoking the lower court decisions that have held the nonrecognition language of § 337 superseded by the tax benefit rule in the context of recoveries. *E. g.,* *Commissioner* v. *Anders*, 414 F. 2d 1283 (CA10), cert. denied, 396 U. S. 958 (1969); *Anders* v. *United States*, 199 Ct. Cl. 1, 462 F. 2d 1147, cert. denied, 409 U. S. 1064 (1972). Those cases are relevant because when Congress enacted § 337, it hoped to allow taxpayers to enjoy some of the tax benefits of § 336 even when they do not precisely satisfy the formal prerequisites for applying

Accordingly, I concur in the Court's judgment in No. 81–485 and respectfully dissent in No. 81–930.

JUSTICE BLACKMUN, dissenting.

These consolidated cases present issues concerning the so-called "tax benefit rule" that has been developed in federal income tax law. In No. 81–485, the Court concludes that the rule has no application to the situation presented. In No. 81–930, it concludes that the rule operates to the detriment of the taxpayer with respect to its *later* tax year. I disagree with both conclusions.

I

In No. 81–485, the Court interprets § 164(e) of the Internal Revenue Code of 1954, 26 U. S. C. § 164(e). See *ante*, at 392–395. It seems to me that the propriety of a 1972 deduction by the Bank under § 164(e) depended upon the payment by the Bank of a state tax on its shares. This Court's decision in *Lehnhausen* v. *Lake Shore Auto Parts Co.*, 410 U. S. 356 (1973), rendered any such tax nonexistent and any deduction therefore unavailable. I sense no "focus of Congress . . . on the act of payment rather than on the ultimate use of the funds by the State." *Ante*, at 394. The focus, instead, is on the payment of a *tax*. Events proved that there was no tax. The situation, thus, is one for the application, not the nonapplication, of some tax benefit rule.

I therefore turn to the question of the application of a proper rule in each of these cases.

that section. But assuming that the *Anders* construction of § 337 is correct (a point this Court has never decided), I would think the tail wags the dog if one construes § 336 in light of § 337, rather than vice versa. Cf. *Tennessee-Carolina Transportation, Inc.* v. *Commissioner, supra,* at 453 (Tannenwald, J., dissenting) ("Section 337 was designed to be a shield for taxpayers and not a sword to be used against them in applying other sections of the Code").

## II

The usual rule, as applied to a deduction, appears to be this: Whenever a deduction is claimed, with tax benefit, in a taxpayer's federal return for a particular tax year, but factual developments in a later tax year prove the deduction to have been asserted mistakenly in whole or in part, the deduction, or that part of it which the emerging facts demonstrate as excessive, is to be regarded as income to the taxpayer in the later tax year. With that general concept (despite occasionally expressed theoretical differences between "transactional parity" or "transactional inconsistency," on the one hand, and, on the other, a need for a "recovery") I have no basic disagreement.

Regardless of the presence of § 111 in the Internal Revenue Code of 1954, 26 U. S. C. § 111 (1976 ed. and Supp. V), it is acknowledged that the tax benefit rule is judge-made. See, e. g., 1 J. Mertens, Law of Federal Income Taxation § 7.34, p. 114 (J. Doheny rev. ed. 1981); Bittker & Kanner, The Tax Benefit Rule, 26 UCLA L. Rev. 265, 266 (1978). It came into being, apparently, because of two concerns: (1) a natural reaction against an undeserved and otherwise unrecoverable (by the Government) tax benefit, and (2) a perceived need, because income taxes are payable at regular intervals, to promote the integrity of the annual tax return. Under this approach, if a deduction is claimed, with some justification, in an earlier tax year, it is to be allowed in that year, even though developments in a later year show that the deduction in the earlier year was undeserved in whole or in part. This impropriety is then counterbalanced (concededly in an imprecise manner, see ante, at 378, n. 10, and 380–381, n. 12) by the inclusion of a reparative item in gross income in the later year. See Burnet v. Sanford & Brooks Co., 282 U. S. 359 (1931); Healy v. Commissioner, 345 U. S. 278 (1953).* In

---

*In Sanford & Brooks, the earlier tax years were 1913–1916 and the later year was 1920. In Healy, the earlier year was 1945 and the later

*Nash* v. *United States*, 398 U. S. 1, 3 (1970), the Court succinctly phrased it this way: "[A] recovery of an item that has produced an income tax benefit in a prior year is to be added to income in the year of recovery."

I have no problem with the rule with respect to its first underlying concern (the rectification of an undeserved tax benefit). When a taxpayer has received an income tax benefit by claiming a deduction that later proves to be incorrect or, in other words, when the *premise* for the deduction is destroyed, it is only right that the situation be corrected so far as is reasonably possible, and that the taxpayer not profit by the improper deduction. I am troubled, however, by the tendency to carry out the second concern (the integrity of the annual return) to unnecessary and undesirable limits. The rule is not that sacrosanct.

In No. 81–485, Hillsboro National Bank, in its 1972 return, took as a deduction the amount of assessed state property taxes the Bank paid that year on its stock held by its shareholders; this deduction, were there such a tax, was authorized by the unusual, but nevertheless specific, provisions of § 164(e) of the Code, 26 U. S. C. § 164(e). The Bank received a benefit by the deduction, for its net income and federal income tax were reduced accordingly. Similarly, in No. 81–930, Bliss Dairy, Inc., which kept its books and filed its returns on the cash receipts and disbursements method, took a deduction in its return for its fiscal year ended June 30, 1973, for cattle feed it had purchased that year. That deduction was claimed as a business expense under § 162(a) of the Code, 26 U. S. C. § 162(a). The Dairy received a tax benefit, for its net income and federal income tax for fiscal 1973 were reduced by the deduction. Thus far, everything is clear and there is no problem.

In the Bank's case, however, a subsequent development, namely, the final determination by this Court in 1973 in

———

years were 1947 and 1948. In *Healy*, the Court specifically noted the probable complicating factor of a statute of limitations barrier. 345 U. S., at 284.

*Lehnhausen, supra,* that the 1970 amendment of the Illinois Constitution, prohibiting the imposition of the state property taxes in question, was valid, eliminated any factual justification for the 1972 deduction. And, in the Dairy's case, a postfiscal year 1973 development, namely, the liquidation of the corporation and the distribution of such feed as was unconsumed on June 30, 1973, to its shareholders, with their consequent ability to deduct, when the feed thereafter was consumed, the amount of their adjusted basis in that feed, similarly demonstrated the impropriety of the Dairy's full-cost deduction in fiscal 1973.

I have no difficulty in favoring some kind of "tax benefit" adjustment in favor of the Government for each of these situations. An adjustment should be made, for in each case the beneficial deduction turned out to be improper and undeserved because its factual premise proved to be incorrect. Each taxpayer thus was not entitled to the claimed deduction, or a portion of it, and this nonentitlement should be reflected among its tax obligations.

This takes me, however, to the difficulty I encounter with the second concern, that is, the unraveling or rectification of the situation. The Commissioner and the United States in these respective cases insist that the Bank and the Dairy should be regarded as receiving income in the very next tax year when the factual premise for the prior year's deduction proved to be incorrect. I could understand that position, if, in the interim, the bar of a statute of limitations had become effective or if there were some other valid reason why the preceding year's return could not be corrected and additional tax collected. But it seems to me that the better resolution of these two particular cases and others like them—and a resolution that should produce little complaint from the taxpayer—is to make the necessary adjustment, whenever it can be made, in the tax year for which the deduction was originally claimed. This makes the correction where the correction is due and it makes the amount of net income for each year a true amount and one that accords with the facts, not

one that is structured, imprecise, and fictional. This normally would be accomplished either by the taxpayer's filing an amended return for the earlier year, with payment of the resulting additional tax, or by the Commissioner's assertion of a deficiency followed by collection. This actually is the kind of thing that is done all the time, for when a taxpayer's return is audited and a deficiency is asserted due to an overstated deduction, the process equates with the filing of an amended return.

The Dairy's case is particularly acute. On July 2, 1973, on the second day after the end of its fiscal year, the Dairy adopted a plan of liquidation pursuant to § 333 of the Code, 26 U. S. C. § 333. That section requires the adoption of a plan of liquidation; the making and filing, within 30 days, of written elections by the qualified electing shareholders; and the effectuation of the distribution in liquidation within a calendar month. §§ 333(a), (c), and (d). It seems obvious that the Dairy, its management, and its shareholders, by the end of the Dairy's 1973 fiscal year on June 30, and certainly well before the filing of its tax return for that fiscal year, all had conceived and developed the July 2, 1973, plan of liquidation and were resolved to carry out that plan with the benefits that they felt would be afforded by it. Under these circumstances, we carry the tax benefit rule too far and apply it too strictly when we utilize the unconsumed feed to create income for the Dairy for fiscal 1974 (the month of July 1973), instead of decreasing the deduction for the same feed in fiscal 1973. Any concern for the integrity of annual tax reporting should not demand that much. I thus would have the Dairy's returns adjusted in a realistic and factually true manner, rather than in accord with an inflexibly administered tax benefit rule.

Much the same is to be said about the Bank's case. The decisive event, this Court's decision in *Lehnhausen*, occurred on February 22, 1973, within the second month of the Bank's 1973 tax year. Indeed, it took place before the Bank's calendar year 1972 return would be overdue. Here again, an ac-

curate return for 1972 should be preferred over inaccurate returns for both 1972 and 1973.

This, in my view, is the way these two particular tax controversies should be resolved. I see no need for anything more complex in their resolution than what I have outlined. Of course, if a statute of limitations problem existed, or if the facts in some other way prevented reparation to the Government, the cases and their resolution might well be different.

I realize that my position is simplistic, but I doubt if the judge-made tax benefit rule really was intended, at its origin, to be regarded as applicable in simple situations of the kind presented in these successive-tax-year cases. So often a judge-made rule, understandably conceived, ultimately is used to carry us further than it should.

I would vacate the judgment in each of these cases and remand each case for further proceedings consistent with this analysis.