T.C. Memo. 2000-42


UNITED STATES TAX COURT


EDITH HUNTER HORNBERGER, ET AL.,[1] Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 3656-98, 3658-98,         Filed February 9, 2000.
            3676-98.


<u>Craig D. Bell</u>, for petitioners.

<u>John C. McDougal</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


JACOBS, <u>Judge</u>:  In separate notices of deficiency, respondent

determined the following deficiencies and additions to tax:

---

[1]     Cases of the following petitioners are consolidated
herewith for purposes of trial, briefing, and opinion:  Estate of
Edna B. Hunter, Deceased, Shirley Hunter, Administratrix, docket
No. 3658-98; and EV Hunter Trust, Shirley M. Hunter and T.
William Dowdy, Co-Trustees, docket No. 3676-98.

Re:  Edith H. Hornberger, docket No. 3656-98:

| Year | Deficiency | Addition to Tax Sec. 6651(a) |
|------|-----------|------------------------------|
| 1992 | $744,724 | $47,810 |

Re: Estate of Edna B. Hunter, Deceased, Shirley M. Hunter Administratrix, docket No. 3658-98:

| Year | Deficiency | Addition to Tax Sec. 6651(a) |
|------|-----------|------------------------------|
| 1992 | $722,052 | $180,513 |

Re:  EV Hunter Trust, Shirley M. Hunter and T. William Dowdy, Co-Trustees, docket No. 3676-98:

| Year | Deficiency | Addition to Tax Sec. 6651(a) |
|------|-----------|------------------------------|
| 1992 | $722,238 | $166,397 |

The deficiency and addition to tax in each of these consolidated cases is a duplication of the deficiency and addition to tax in the other cases.

Following concessions by the parties, the issues for decision are: (1) Whether interest on estate taxes paid by the EV Hunter Trust (the trust) in 1988 and deducted by the trust's grantor, Edith H. Hornberger (petitioner), on her 1988 amended individual tax return, and refunded by the Internal Revenue Service (IRS) to the Estate of Edna B. Hunter, Deceased (the estate), in 1992 constitutes income in 1992, pursuant to the tax-benefit rule, to

the estate, the trust, or petitioner; and (2) whether a section 6651(a) addition to tax for failure to timely file a tax return is applicable.

All section references are to the Internal Revenue Code in effect for the year under consideration. All Rule references are to the Tax Court Rules of Practice and Procedure. All dollar amounts are rounded.

FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly. The stipulation of facts and the attached exhibits are incorporated herein by this reference.

Background

Petitioner resided in Springfield, Virginia, on the date her petition was filed. The legal address of both the trust and the estate was in Springfield, Virginia, at the time they petitioned this Court.

Decedent and Her Estate

Edna B. Hunter's (decedent's) only child, Herbert C. Hunter (Mr. Hunter), was married to Shirley M. Hunter (Mrs. Hunter). Mr. and Mrs. Hunter had a daughter, petitioner, who was born on November 3, 1968. Mr. Hunter was murdered in 1976.

On April 11, 1984, decedent died intestate, leaving an estate valued at over $20 million to petitioner. Mrs. Hunter qualified and served as the administratrix of decedent's estate. Mrs. Hunter

retained Henry Clay (Mr. Clay), the family accountant and attorney, to advise her and to prepare legal and tax documents for the estate.

The Trust

On November 11, 1986, 8 days after her 18th birthday, petitioner executed a trust indenture[2] pursuant to which an irrevocable trust was established. The trust was to exist until November 3, 2003 (the date petitioner would turn 35 years old); however, the terms of the trust indenture could be modified or amended (and the trust could be terminated) at the end of each 5-year period during the term of the trust provided the change (or termination) was agreed to by all of the trustees and petitioner. Ultimately, all of the assets petitioner inherited from the decedent were placed into the trust.

The trust had three cotrustees: T. William Dowdy (Mr. Dowdy), Mrs. Hunter, and Mr. Clay. Mr. Dowdy, an attorney, dealt with real estate issues (particularly condemnation proceedings and other matters requiring court appearances). Mrs. Hunter acted as a liaison between petitioner and Mr. Clay. Pursuant to the provisions of the indenture, two trustees could act on any matter within their collective authority; in reality, Mr. Clay alone determined the amount of the trust distributions.

---

[2] The trust was established at the recommendation of Mr. Clay. At the time petitioner signed the trust indenture, Mr. Clay did not explain to her how the trust would operate.

Mr. Clay managed and controlled the trust, its assets, and all relevant files relating thereto. He alone (1) assumed responsibility for investment decisions, (2) made distributions to petitioner, (3) maintained the trust books and records, and (4) prepared and filed tax returns and supporting documentation. He prepared annual accountings of the trust's finances on behalf of the cotrustees (depicting distributions from the trust as well as assets contained in the trust).

As of spring 1993, Mr. Clay had fallen a few years behind in preparing these accountings because most of the trust assets consisted of unimproved land near Springfield Mall, which was tied up in condemnation proceedings.

Mr. Clay believed that petitioner was too young to comprehend the substantial inheritance she had received. He took the position that only after petitioner became older would she appreciate the size and type of assets inherited and be in a position to properly manage her inheritance. Consequently, Mr. Clay provided petitioner with minimal information regarding her inheritance: he did not prepare any statements detailing the size or composition of the trust assets, the income generated by the trust, or the amounts of distributions or expenditures of funds that were made on her behalf. Because of Mr. Clay's philosophy, petitioner was clueless as to the size and type of the trust assets. Petitioner was aware only that the trust assets included real estate, which she believed

had a value of $1 to $2 million.

The Estate's Form 706 and Petitioner's 1988 Amended Return

On January 11, 1985, the estate timely filed a Form 706, U.S. Estate Tax Return, reporting $7,333,264 as the estate tax due. At the time the return was filed, the estate remitted $2,833,264 as a partial payment. The return was audited, and a notice of deficiency was issued determining an additional estate tax liability of $4,802,358 and additions to tax of $607,017. The estate did not contest the deficiency or additions to tax, and they were duly assessed.

Between January 21, 1985, and October 18, 1988, a total of $16,403,665 (including the $2,833,264 partial payment remitted with the return) was paid toward the balance due (pursuant to the estate tax return, the deficiency and additions to tax, and the statutory interest). The trust paid a portion of this balance in 1988, including $2,357,493[3] of interest on the estate's deficiency.

Mr. Clay treated the trust as a complex (taxable) trust in preparing and filing the trust's fiduciary income tax returns.[4] Accordingly, the trust's 1988 Form 1041, U.S. Fiduciary Income Tax Return, reflected a total $2,724,752 deduction for interest paid,

---

[3]     In the parties' stipulation of facts, the figure for interest paid is erroneously reflected as $2,357,495. We use the correct figure reflected on the return.

[4]     A complex trust is a separate taxpayer subject to the income tax. See sec. 1(e).

which included the $2,357,493 paid.

In October 1991, the IRS and the estate entered into a settlement agreement in which the Federal estate tax liability and additions to tax previously assessed were decreased in the respective amounts of $4,122,736 and $1,042,403.

In late September 1992, the IRS, the trust representatives, and petitioner agreed that the trust should have been taxable as a grantor trust pursuant to sections 671 through 678 since its inception.[5] Accordingly, in November 1992, amended Forms 1041 were filed for the trust, recharacterizing the trust as a grantor trust. As a result of this recharacterization, the $2,357,493 of interest paid on the estate tax was attributed to petitioner and was reflected as an interest deduction on her 1988 amended income tax return.[6]

The Refund Check

On February 18, 1992, the IRS issued a $10,364,431 refund check (the refund check) made payable to the estate. The refund check included $2,290,469 in interest that previously had been

---

[5]    A grantor trust is not subject to the income tax. Rather, all of the income and deductions pertaining to a grantor trust must be taken into account by the grantor. See secs. 671-678.

[6]    The "Explanation of Change to Income and Tax Reduction For 1988" attached to petitioner's 1988 amended return in relevant part states: "the administrative expenses of the Hunter Estate are to be flowed through the E.V. Hunter Trust (grantor trust) and ultimately reflected on the individual income tax returns of Edith Hunter Hornberger."

assessed against the estate and paid by the trust, as well as an additional $2,908,823 in statutory interest on the overpayment. The parties have stipulated: "Upon receipt of the estate tax refund check, the administratrix of the Hunter Estate provided the check to Edith Hunter Hornberger, who negotiated it to the co-trustees of the Hunter Trust, who deposited it into the Trust bank account."

Of the interest component of the refund check, petitioner reported $2,866,927 (the portion which her representatives calculated as the interest on the overpayment) on her 1992 individual tax return.[7] The remainder of the interest component of the refund check, $2,290,469, represented a return of a portion of the $2,357,493 deficiency interest the trust paid in 1988.[8]

Neither petitioner, the trust, nor the estate reported the $2,290,469 refund of overpaid assessed interest on her or its respective 1992 return. No Form 1099-INT or other informational return was issued to the estate or the trust.

---

[7]   The parties now agree that (1) the interest on the overpayment is $2,908,823, and (2) the balance of $41,896 is also reportable by petitioner as interest income.

[8]   On Mar. 18, 1999, respondent provided petitioners with a copy of the IRS Office of Appeals posting voucher approving the manual refund of estate taxes, additions to tax, and interest for the estate refund. This posting voucher notes that the $10,364,431 total payments included $2,290,469 in interest previously assessed against the estate. It also specifies an additional $2,908,823 of statutory interest on the Federal estate tax overpayment that was included in the refund to the estate.

Mr. Clay, Keith Hornberger, and the Trust Distributions

Mr. Clay managed the trust assets conservatively. Other than paying a portion of petitioner's education and other living expenses, he gave her a modest monthly cash allowance, which was deposited directly into her bank account. In 1986, petitioner's monthly allowance was $500.

Petitioner attended college part time and worked part time as a bank teller. On July 2, 1988, she married Keith Hornberger (Mr. Hornberger). Following her marriage, petitioner no longer attended school and began working full time. After the couple had children (in 1989), petitioner ceased working outside their home. At all relevant times, Mr. Hornberger was unemployed.

Mr. Clay periodically increased petitioner's monthly allowance but only after and in response to her requests.[9] Mr. Clay did not approve of petitioner's marriage to Mr. Hornberger. Mr. Clay believed Mr. Hornberger to be a freeloader; thus, he kept the trust financial information from petitioner because he feared that Mr. Hornberger and his "questionable friends" might try to "milk" the trust through petitioner.[10]

---

[9] At the time of petitioner's marriage to Mr. Hornberger, she asked Mr. Clay to increase her monthly allowance. Approximately a week later, Mr. Clay agreed to do so, increasing her monthly allowance to $1,000.

[10] Mr. Clay's concern arose from an incident in the late 1980's when the trust provided $40,000 to Mr. Hornberger in order for him to start an automobile detailing business. The funds
(continued...)

Adding to Mr. Clay's skepticism, during 1992, Mr. Hornberger experienced a bipolar mental disorder that became progressively worse. Mr. Hornberger threatened suicide and violence against his family (i.e., he told Mrs. Hunter that he would "cut her" or "slice her up"). Petitioner was forced to move with her children out of the family home. She did not inform Mr. Hornberger of their whereabouts. Mr. Hornberger was then hospitalized for observation several times, and on November 3, 1992, he escaped from a hospital. After being confronted by police and the possibility of his arrest, Mr. Hornberger agreed to a 30- to 60-day confinement. He was placed on medication. In order to be convinced that he was properly taking his medication, petitioner waited approximately 1 month after his release from the hospital to move back into the family home in February or March 1993.

Mr. Clay objected to petitioner's requests that the trust pay Mr. Hornberger's hospitalization bills, which, at the time, had accumulated to approximately $50,000. As a result of her strained relationship with Mr. Clay, petitioner frequently approached her mother (as cotrustee) to intercede on her behalf in obtaining additional funds from the trust. It was only after Mrs. Hunter's intervention that Mr. Clay permitted the trust to pay Mr.

---

[10](...continued)
were quickly spent, and no business was created. From that point on, Mr. Clay took a hard-nosed position with petitioner whenever she requested additional funds from the trust.

Hornberger's medical expenses. By 1992, Mr. Clay increased petitioner's monthly allowance to $2,500.

## Mr. Clay's Demise

From 1986 to 1992, Mr. Clay prepared the annual tax returns for petitioner and the trust. Petitioner usually went to Mr. Clay's office to sign her individual tax returns. She generally was not provided an opportunity to review the returns; rather, Mr. Clay had the return open to the signature page, and petitioner was instructed to sign it. Mr. Clay alone signed the trust fiduciary income tax return; petitioner never saw this return.

During the fall of 1992 (at the age of 88), Mr. Clay suffered several heart ailments; his strength and physical endurance weakened. On several occasions during the latter part of 1992, Mr. Clay fell in the parking lot outside his law office. His falls and physical condition resulted in his hospitalization on several occasions in late 1992 and in early 1993.

Concurrently, Mr. Clay was the care provider for his wife, who suffered from Alzheimer's disease. In late November 1992, they moved from the family home to the Palm Springs Retirement Community. Mr. Clay continued practicing law, going to his office when possible.

In early 1993, Mrs. Hunter and Mr. Dowdy were aware of Mr. Clay's deteriorating health and periodically discussed with him the progress he had made regarding the preparation and filing of the

required returns. Mr. Clay, who had remained mentally alert, assured them that he was progressing in the usual manner in preparing the 1992 fiduciary income tax return and the allocation statement for petitioner. During March and April of 1993, petitioner inquired about her tax return with Mr. Clay and her mother; she was told that the tax returns and grantor trust allocation statements were being prepared.

Mr. Clay informed the cotrustees that sufficient estimated tax payments had been previously made. He specifically informed Mr. Dowdy that if he was unable to complete and file the 1992 returns, he would prepare and file appropriate extension forms.

Mr. Clay's health continued to decline through the spring of 1993. On July 1, 1993, he was moved to a convalescent home, where he died 5 days later.

As a result of Mr. Clay's deteriorating health, he neither completed the 1992 information return for the trust nor filed the necessary 1992 returns for petitioner, the estate, or the trust within the prescribed period. (No extensions were requested.) Following Mr. Clay's death, the surviving cotrustees retained a certified public accountant to prepare and file 1992 tax returns for the estate, the trust, and petitioner. On February 2, 1994, the returns (a Form 1040 for petitioner and Forms 1041 for the estate and the trust) were filed for all three taxpayers' 1992 tax year.

Notices of Deficiency

Separate notices of deficiency were mailed to petitioner, the trust, and the estate.  The "Explanation of Items" attached to each of the notices stated:

Recovery of Prior Deduction

Per return       $   -0-
As Corrected     2,290,469
Adjustment       2,290,469

Since you, and/or pass-through entities of which you are beneficiary, recovered an amount deducted in a prior year, we included it in your income.  Under the tax-benefit rule and pursuant to the duty of consistency, this amount is income to you.  In accordance with Internal Revenue Code section 61 income from whatever source is taxable.

Interest Income from IRS

Per return  $2,866,927
As Corrected 2,908,823
Adjustment      41,896

Since you, and/or pass-through entities of which you are a beneficiary, received interest income on a refund from the Internal Revenue Service, we have included the amount shown in your income.

Each notice also determined a section 6651(a) addition to tax.

ULTIMATE FINDINGS OF FACT

1.   In 1992, petitioner received a refund of $2,290,469 in interest that she had deducted as interest expense on her 1988 amended return.

2.   Petitioner had reasonable cause for the late filing of her 1992 Federal income tax return.

OPINION

Issue 1.  Tax-Benefit Rule

Respondent contends that the tax-benefit rule requires petitioner to include in her 1992 income the $2,290,469 refund of interest  which was deducted on her 1988 amended tax return.  In the alternative, respondent asserts that that amount is includable in the income of either the estate or the trust.[11]

The tax-benefit rule requires an amount to be currently included as income to the extent that:  (1) The amount was properly deducted in a year prior to the current year; (2) the deduction resulted in a tax benefit; (3) an event occurs in the current year that is fundamentally inconsistent with the premises on which the deduction was originally based; and (4) a nonrecognition provision of the Internal Revenue Code does not prevent the inclusion in gross income.  See, e.g., Hillsboro Natl. Bank v. Commissioner, 460 U.S. 370, 383-384 (1983); Frederick v. Commissioner, 101 T.C. 35, 41 (1993).  A current event is an event that is fundamentally inconsistent with the premises on which the deduction was originally based when that event would have prevented the deduction

---

[11]    The deficiencies and additions respondent determined against the estate and trust are alternatives.  Neither a deficiency nor an addition to tax will be due from either entity should we hold that petitioner realized income pursuant to the tax-benefit rule.

if the event had occurred in the year of the deduction. See Hillsboro Natl. Bank v. Commissioner, supra; Frederick v. Commissioner, supra at 41.

Petitioner maintains that the tax-benefit rule is not herein applicable. She posits that the estate and petitioner are different persons--petitioner claimed the interest deduction on her 1988 amended tax return; the refund check was payable to the estate in 1992 (as the estate's recovery in 1992 of the amount deducted). Continuing, petitioner asserts that it is of no consequence that the trust (or petitioner) ultimately received the proceeds from the refund check  because it was the estate which had title to, and possessed, the refund.

Respondent asserts petitioner's position is flawed, relying on the stipulation agreed to by the parties: "Upon receipt of the estate tax refund check, the administratrix of the Hunter Estate provided the check to Edith Hunter Hornberger, who negotiated it to the co-trustees of the Hunter Trust, who deposited it into the trust bank account." Respondent contends that although the refund check was payable to the estate, the funds were returned in 1992 to petitioner (who had taken the interest deduction on her 1988 amended return).[12] According to respondent, it is inconsistent for

---

[12] Respondent points to the stipulated fact that the 1992 refund check included "$2,290,468.85 [which] represented a return of part of the $2,357,493 deficiency interest paid by the trust in 1988." Moreover, the parties stipulated that the amended
(continued...)

petitioner to have claimed a deduction on her 1988 amended return and not reported the 1992 refund she received.  We agree with respondent.

The trust originally paid the interest on the tax deficiency and deducted that amount, $2,724,752, as an interest expense on its 1988 fiduciary return.  When this return was amended to reflect the agreement among the IRS, the trust representatives, and petitioner to recharacterize the trust as a grantor trust, the interest expense deduction the trust had claimed was allocated to petitioner and was reflected on her amended 1988 income tax return.  The deduction resulted in a tax benefit in proportion to the full amount of the deduction.  And the amount was ultimately returned to petitioner (via the refund check) in 1992.[13]

In sum, the refund of the interest on the tax deficiency, previously deducted, gives rise to taxable income under the tax-

---

[12](...continued)
return attributed "to Edith Hunter Hornberger all trust income and deductions, including the deduction for the $2,357,495.08 of interest paid on the estate tax."

[13]    In Hillsboro Natl. Bank v. Commissioner, 460 U.S. 370 (1983), the Hillsboro Bank paid State taxes and deducted them when paid, pursuant to sec. 164(e).  Later, the State refunded the taxes directly to the bank's shareholders.  The Government sought to include the shareholders' refund of the State taxes in the income of the bank.  See id. at 372-374.  The Supreme Court concluded that "unless a nonrecognition provision of the Internal Revenue Code prevents it, the tax benefit rule ordinarily applies to require the inclusion of income when events occur that are fundamentally inconsistent with an earlier deduction."  Id. at 372.

benefit rule. The $2,290,469 petitioner deducted on her amended 1988 return went from the trust, to the IRS, to the estate, to petitioner, and back to the trust. Petitioner and the trust parted with no money; consequently, it would be inconsistent to permit petitioner to retain the benefit of the $2,290,469 deduction when that amount was refunded to her. See, e.g., <u>Frederick v. Commissioner</u>, <u>supra</u>. Further, we are mindful that respondent's tax benefit analysis is consistent with the September 1992 agreement that the trust had been a grantor trust since its inception, as reflected on the 1988 amended returns for the trust and petitioner. Accordingly, we hold that the $2,290,469 refunded constitutes income to petitioner pursuant to the tax-benefit rule for her 1992 tax year.

<u>Issue 2. Section 6651(a) Addition to Tax</u>

We now address whether the imposition of the section 6651(a) addition to tax for failure to timely file a return is herein appropriate. The section 6651(a) addition to tax can be avoided if the taxpayer's failure to file was: (1) Due to reasonable cause, and (2) not due to willful neglect. See sec. 6651(a); Rule 142(a); <u>United States v. Boyle</u>, 469 U.S. 241, 245-246 (1985); <u>United States v. Nordbrock</u>, 38 F.3d 440 (9th Cir. 1994). "Reasonable cause" requires a taxpayer to demonstrate that he exercised ordinary business care and prudence and was nevertheless unable to file a return within the prescribed time. See <u>United States v. Boyle</u>,

supra at 246; sec. 301.6651-1(c)(1), Proced. & Admin. Regs. Willful neglect means a conscious, intentional failure to file or reckless indifference.  See United States v. Boyle, supra at 245.

Petitioner argues that personal problems and the unavailability of records constituted reasonable cause for petitioner's failure to timely file her 1992 return.  Respondent, on the other hand, contends that petitioner could have obtained sufficient information if she had so desired.  We agree with petitioner.

We are satisfied that petitioner was ignorant of the trust's large income and assets.  She was not provided with any documentation that would inform her what, if any, funds she received from the trust were taxable income.  Mr. Clay, as principal trustee of the trust, possessed and controlled the financial records pertaining to the trust.  The uncontradicted testimony reveals that Mr. Clay was extremely secretive with regard to these records because of his concern about petitioner's young age as well as the undesirable qualities Mr. Hornberger exhibited. He refused to hand over relevant information regarding the trust. In addition, Mr. Clay did not permit Mr. Dowdy or Mrs. Hunter access to the financial records.

Moreover, given Mr. Clay's previous track record, there was nothing to suggest that he would be late in performing his fiduciary responsibilities.  Petitioner, Mrs. Hunter, and Mr. Dowdy

testified that although Mr. Clay was physically ill during 1992 and 1993, he remained mentally sharp until his death. Petitioner and the cotrustees frequently inquired as to Mr. Clay's progress regarding the necessary tax documents. Mr. Clay repeatedly assured them of his progress. Absent Mr. Clay's illness, undoubtedly, the appropriate documents would have been prepared and filed.

We have held that the inability of a taxpayer to obtain records may constitute reasonable cause to justify setting aside the failure to timely file addition to tax. See, e.g., Berenbeim v. Commissioner, T.C. Memo. 1992-272; Connor v. Commissioner, T.C. Memo. 1982-302. We conclude that petitioner was unable to obtain the necessary trust records from Mr. Clay, and consequently had reasonable cause not to file her 1992 individual tax return, and did not willfully neglect her duty to do so.

On the basis of the record before us, we conclude that petitioner exercised "ordinary business care and prudence", but because of circumstances beyond her control, she was unable to file her tax return timely. Accordingly, we hold that petitioner is not liable for the addition to tax and respondent's section 6651(a) determination is not sustained.

To reflect the foregoing and the parties' concessions,

<u>Decision will be entered under Rule 155 in docket No. 3656-98</u>.

<u>Decision will be entered for petitioner Estate of Edna B. Hunter, Deceased, Shirley M. Hunter, Administratrix in docket No. 3658-98</u>.

<u>Decision will be entered for petitioner EV Hunter Trust, Shirley M. Hunter and T. William Dowdy, Co-Trustees in docket No. 3676-98</u>.